[No. B198139. Second Dist., Div. Three. Apr. 30, 2008.]

ANTELOPE VALLEY PRESS, Plaintiff and Appellant, v.
STEVE POIZNER, as Insurance Commissioner, etc., et al., Defendants and
Respondents;
STATE COMPENSATION INSURANCE FUND, Real Party in Interest.

COUNSEL

Law Offices of Patrick J. Sullivan, Patrick J. Sullivan; Zinser Law Firm, L. Michael Zinser and Glenn E. Plosa for Plaintiff and Appellant.

Edmund G. Brown, Jr., Attorney General, Felix Leatherwood and Philip C. Griffin, Deputy Attorneys General, for Defendants and Respondents.

Robert W. Daneri, Charles W. Savage, Betty R. Quarles and Isabel C. Lallana for Real Party in Interest.

OPINION

**CROSKEY, J.**—This case poses the specific question whether, for purposes of workers' compensation insurance, persons who make deliveries of newspapers for the newspaper publisher Antelope Valley Press (AVP) are independent contractors or employees. The question arises not under a claim for workers' compensation benefits by one of the newspaper carriers (carriers), but rather with respect to the insurance premium that AVP was assessed for its workers' compensation coverage.

California's State Compensation Insurance Fund (State Fund) classified the carriers as employees for purposes of AVP's workers' compensation policy. AVP appealed the classification to the Department of Insurance's administrative hearing bureau. (Ins. Code, § 11737, subd. (f); Cal. Code Regs., tit. 10, § 2509.46.) The administrative law judge (ALJ) who heard the case issued a lengthy proposed decision wherein he concluded that the carriers are employees for purposes of workers' compensation insurance. The Insurance Commissioner (Commissioner) adopted that decision.

Thereafter, AVP filed a petition for writ of administrative mandamus. (Code Civ. Proc., § 1094.5.) Reviewing the Commissioner's decision under the substantial evidence test, the trial court determined that the ALJ's findings are supported by substantial evidence. The court also concluded that under California's workers' compensation law, the ALJ's conclusion that AVP's carriers are employees should be affirmed. AVP has appealed the trial court's judgment denying its petition for writ of administrative mandamus.[1]

---

[1] Both State Fund and the Commissioner participated in this appeal and opposed AVP.

■ Our review of the facts of this case and relevant law convinces us that the trial court correctly ruled that the administrative record supports the conclusion that the carriers are employees for purposes of workers' compensation law, not independent contractors. Therefore, we will affirm the trial court's judgment.

## *FACTUAL BACKGROUND*[2]

### 1. *Delivery of AVP's Publications*

AVP publishes newspapers in various formats for circulation in Los Angeles and Kern Counties. Its daily newspaper, the Antelope Valley Press (the Press), has a home delivery of 18,000 to 20,000 copies Monday through Saturday, and approximately 25,000 copies on Sunday. Home deliveries are made by the carriers, who are paid according to the number of copies of the Press they are given to deliver. As discussed below, the per copy rate paid to the carriers varies. The written contracts between AVP and its carriers provide that papers must be delivered in a safe and dry condition. If a carrier chooses to wrap the Press in a plastic bag to keep it from getting wet or otherwise harmed, the bag must be yellow or white. The carriers also receive approximately 20 complimentary copies of the Press each day. These free samples, which are called the "C's," are dropped off by the carriers at homes of nonsubscribers. The carriers are paid 3 cents for delivering each C. They are required to put the C's in orange plastic bags, which are provided by AVP as a means of facilitating management's determination that the carriers are actually delivering the C's along their routes. The routes are checked once a week.

Carriers also deliver AVP's magazine-type publication called "Lifestyles." It is delivered with the Press and comes out on the last Thursday of the month. Carriers are required to put Lifestyles in the white plastic bags that AVP provides, and they receive 5 cents per copy they deliver. AVP also publishes a free "TMC" (total market coverage) advertisement paper which is called the "A.V. Express" and has a circulation of approximately 42,000 copies. As with the C's, the carriers are required to place the A.V. Express in colored plastic bags (red) that are provided by AVP, and management checks the routes to verify that deliveries of the A.V. Express are made. The A.V. Express is delivered on Saturday mornings. The carriers receive 3 cents per copy of the A.V. Express they deliver, and are charged 23 cents for each copy they do not actually deliver.[3]

---

[2] The facts that we recite are based on the evidence presented at the administrative hearing.

[3] Some carriers also deliver copies of USA Today.

Deliveries by the carriers are made according to AVP's time schedules. The carriers are expected to pick up their bundles of newspapers by a specific time from a specific location. If a carrier is late, he or she is charged $35 per hour ($0.58333 per minute) to cover AVP's cost of having someone oversee the pickup location until the carrier arrives. Additionally, personnel of AVP may begin folding and bagging the tardy carrier's newspapers after the deadline for pickup so as to facilitate prompt delivery of papers to the customers, and the carrier is charged for the bags even though carriers are not required to put the Press in bags. For the pickup location that is not manned by AVP personnel, there is no requirement as to when a carrier must pick up his or her newspapers there, but the carrier runs the risk that the newspapers will be stolen if the carrier is not on site when they are dropped off, and stolen papers are the financial responsibility of the carrier.

The newspapers are ready to be picked up by the carriers between 12:30 a.m. and 1:00 a.m. On weekdays, carriers are required to finish their deliveries by 5:00 a.m. on in-town routes and 6:00 a.m. on out-of-town routes. On weekends, the delivery deadlines are 6:00 a.m. and 7:00 a.m., respectively. The A.V. Express is to be delivered by noon on Saturday. Sometimes there is more than one part to the Press (usually on Sundays), and carriers are required to assemble the various parts (such as advertising inserts) into a complete package prior to delivering the package to the subscribers.[4]

2. *Payments by Customers, Carriers and AVP*

Home delivery subscribers pay their subscription fees to AVP, not to the carriers. If a home delivery subscriber fails to pay his or her bill, the carrier is not docked unless and until a written stop delivery notice for that customer is given to the carrier. The carriers are charged a $2.50 complaint recording fee if a customer does not receive his or her copy of the Press, does not receive it in a timely manner, or it is damaged. If there are more than two complaints per 1,000 paid deliveries and the carrier has elected to have AVP redeliver the Press, the carrier is also charged a $2.50 redelivery fee per complaint. If the carrier has elected to correct subscriber complaints by himself or herself but does not make the correction within one hour of being notified of the problem, or cannot be reached to receive such notification, then if AVP corrects the complaint the carrier is charged $35 per hour and $0.31 per mile driven by an AVP employee to correct the problem.

---

[4] AVP also hires carriers for delivery of "single copy" drops of bundles of the Press to AVP news racks and retail stores, and those carriers are paid by the bundle/drop. Additionally, AVP has drivers that it considers employees (rather than independent contractors) who deliver the single-copy bundles.

When a carrier receives the newspapers for delivery, he or she also receives a "bundle top" on which is written information to the carrier from AVP, such as a customer's complaint, notice that a customer wants delivery stopped for a certain period of time, notice that a customer has completely terminated delivery service or has begun delivery service, notice that service was terminated for nonpayment, or notice that a customer wants the newspaper left at a certain location at his or her house. Failure to follow the instruction on a bundle top can result in economic charges against the carrier. AVP uses the customer's complaints as a means of monitoring the quality of carriers' work. More than one complaint per month "per one thousand contracted subscriber deliveries per edition (paid, free sample, or TMC, or other)" can result in immediate termination for cause.

As stated, carriers are paid for their deliveries on a per paper basis. Invoices are issued to them every two weeks. The invoices list credits for deliveries of AVP's various publications; chargebacks for complaints, nondeliveries, redeliveries, and late pickups from the dropoff location; charges for supplies purchased from AVP (white and yellow bags, rubberbands); and credits for tips that were paid to AVP by persons on the carrier's route for the benefit of the carrier. Along with the invoices the carrier is given the pay due him or her.

### 3. *The Contracts Signed by AVP's Carriers*

A person seeking to become a carrier for AVP comes to the AVP office and speaks with a district manager or the home delivery manager. The only information the manager seeks from the prospective carrier is whether he or she has a California driver's license, proof of vehicle insurance, and a Social Security number.[5] After that information is obtained, the manager and the applicant review the form contract that AVP has its carriers sign. First, the manager assures himself or herself that the applicant can read, understand, and speak English because the contract is written in English. Then the process of going over the contract continues, and that can take anywhere from three hours to days, including affording the applicant an opportunity to have an attorney review the contract. However at the administrative hearing, AVP's home delivery manager testified he did not know of anyone's ever having asked to have such a review.

---

[5] Although AVP's home delivery manager testified that applicants are asked for proof of vehicle insurance, the ALJ noted the evidence shows that AVP's file maintenance forms for several applicants state that the applicants have no insurance. The information (including lack of insurance) on those file maintenance forms was marked approved, and the forms were filled out the day of, or the day before, the carrier's "start date." The contracts were signed on behalf of AVP on those start dates.

The parties stipulated that the carriers all sign the same basic form contract when coming to work for AVP. The contract is entitled "Independent Contractor Distribution Agreement." It consists of 11 pages, including an appendix and two addendums, and the ALJ's written decision notes the contract is printed in 10-point type. The paragraph in the contract that is entitled "Independent Contractor Status" states that the carriers are independent contractors and not employees of AVP. The carriers are described as "self-employed, independent distributor[s]," and referred to throughout the contract as "contractor[s]." Another paragraph provides that carriers will not receive the benefits that are paid by AVP "to its employees."

Although the contract provides for nonexclusive employment in that the carriers are permitted to have other work, the ALJ found there was no evidence presented at the administrative hearing that any of AVP's carriers hold themselves out as being an independent delivery business. Of the six carriers who testified for AVP at that hearing, one previously worked as a gardener. Another works as a contract mail carrier. Two have their own landscape business. A fifth stated he is employed at a movie studio as an office worker. The sixth stated he had recently started an Internet distribution business, that he works from his home, and that in 2003 his only income was from being a carrier for AVP.[6]

The form contract is for a term of one year. Either party can terminate the contract without cause with 30 days' written notice. Either party can terminate the contract, effective immediately with written notice, if the other party commits a material breach. Material breaches by a carrier include, but are not limited to, failure to deliver or timely deliver, failure to remedy a subscriber's complaint, failure to obtain and maintain automobile insurance, and failure to obtain and maintain workers' compensation insurance if the carrier employs others to work on his or her delivery route. AVP also reserves the right to suspend the contract without notice in the event of natural disasters, strikes, riots, war, and other causes beyond AVP's control, as well as in the event AVP temporarily or permanently ceases to publish the Press. Using the

---

[6] Testimony and other evidence at the administrative hearing focused on the year 2003 because AVP applied to State Fund for workers' compensation coverage for 2003, and it was State Fund's assessed premium for that policy year that sparked the disagreement over whether AVP's carriers are employees or independent contractors for workers' compensation purposes.

A witness employed by the California Newspaper Publishers Association testified that in 2003, there were 117 daily newspapers in California and none of those newspapers were delivered by *acknowledged* employees. Rather, the daily newspapers treat the persons who deliver their papers as independent contractors.

evidence presented on the length of carrier service and earnings at AVP, the ALJ found that the majority of carriers working for AVP in 2003 signed their delivery contract for the first time in 2003 or 2002, and earned less than $5,000 in 2003. Only 10 of AVP's carriers earned more than $20,000.[7]

The ALJ also found it "clear . . . that there was an extreme disparity in bargaining position between the Carriers and AV[P]. What is also clear is that the Carriers wanted work, and they signed what they needed to in order to get it." The ALJ went on to say that the lengthy, small print contract was "drafted by sophisticated lawyers [and is] in no sense the product of arm's length negotiations, as might occur, for example, in hiring an independent contractor, specialized and sophisticated in the costs of his business, and able to garner trade from other actual and potential customers."[8] Additionally, he found that the preprinted terms in the contract were not negotiable, and those include, among other things, the amounts of the complaint recording fee, the complaint redelivery fee, the uncorrected complaint fee and the fee for being late in picking up papers to be delivered.[9]

---

[7] AVP's home delivery manager testified that in the two years prior to the administrative hearing, AVP had experienced "a lot of turnover in [carriers]."

[8] AVP objects to the finding of a disparity in bargaining power. Citing *S. G. Borello & Sons, Inc. v. Department of Industrial Relations* (1989) 48 Cal.3d 341 [256 Cal.Rptr. 543, 769 P.2d 399] (*Borello*), AVP argues that such disparity is not a factor in determining employee/independent contractor status. We view the ALJ's discussion about the relative bargaining strengths of AVP and its carriers as a comment on the fact that the carriers are in no position to object to the contractual provisions that explicitly or implicitly state that their status is that of an independent contractor, not an employee, and in no position to object to the many other unfavorable terms of the contracts. The Supreme Court in *Borello* took note of that same situation when it stated that "there is no indication that Borello offers its cucumber harvesters any real choice of terms. . . . The record fails to demonstrate that the harvesters voluntarily undertake an 'independent' and unprotected status." (*Id.* at p. 359.)

[9] AVP asserts in its opening brief that "the unrebutted testimony in the record demonstrated . . . that all of the contract fees were negotiated by 'all' [of the carriers]." However, the record does not support that assertion. Although the parties stipulated at the outset of the administrative law proceedings that all of the carriers signed "the same basic form" contract and that the rates, charges and fees in the contracts were negotiable, they also stipulated that testimony could be taken regarding such negotiations about rates, charges and fees.

After the hearing, the ALJ essentially determined that the stipulation regarding negotiation of rates, charges and fees was too broad, and in reality, "the various chargeback and redelivery fees are pre-typed into the contract forms and are not negotiated." For example, the ALJ found that although AVP's home delivery manager "assented to" AVP's attorney's characterization that the $35-per-hour/31-cents-per-mile delivery correction charges were negotiated charges, there was no evidence that the charges had ever been negotiated, the manager's testimony was *not convincing,* and the charges were already in the contract when the contract was presented to the prospective carriers. The ALJ concluded that the charges were not negotiated or even negotiable.

Regarding the per copy payment received by the carriers, the parties stipulated that the rate that AVP pays carriers for delivering copies of the Press is left blank on the contract and is filled in at the time each individual person signs on to work as a carrier. As demonstrated by copies of the contract that several of the carriers signed and that were presented at the administrative hearing as exhibits, the delivery rate for the Press varies widely. The Press delivery rates in those exhibits were 10, 11, 12, 13, 16.5, and 43 cents, respectively. AVP's home delivery manager testified as to factors that can cause the rate to vary, such as the density or sparseness of customers in a delivery route, the size of a delivery route, the quality of roads in a route, and the number of customers that have special-needs delivery, like requiring that the Press be delivered to a certain place on their property. Also, carriers can renegotiate the payment for delivering the Press if factors in a route change.[10]

Each of the exhibit contracts provided a standard rate of 3 cents per copy for delivery of the A.V. Express and the C's, and those carriers who deliver copies of USA Today are all paid 8 cents per copy. The home delivery manager testified that carriers always accept the rate offered to them for delivering the A.V. Express. He added that although AVP would negotiate the 3 cent rate for the C's, "[h]istorically it hasn't [been negotiated]" and he did not know of any such negotiation because every carrier has accepted that price. He also testified that "not every time you sit across the table from a [carrier] will they negotiate. More than likely they accept whatever the proposed rate is." One of AVP's district managers testified she reviews the contract with applicant carriers and tells them that rates are negotiable. However, she amended her answer and stated she usually does not tell applicants that rates are negotiable but she does negotiate rates with them. A reasonable inference is that she does not tell applicants that rates are negotiable but she will negotiate if asked to do so. Exhibits show that the rates for delivering copies of the C's and the A.V. Express (3 cents per copy) are preprinted on the "file maintenance" forms for each carrier. Only the rate for delivering the Press is left blank, to be filled in for each individual carrier. The ALJ concluded that with the exception of the Press, the delivery rates for a carrier's delivery of AVP's various publications are "fixed."

---

[10] The contracts give AVP the right to alter the carriers' route assignments on 30 days' notice.

## DISCUSSION

1. *Administrative Mandamus*

   a. *Relevant Provisions of Code of Civil Procedure Section 1094.5*

Under the pertinent provisions of Code of Civil Procedure section 1094.5 (section 1094.5), in an administrative mandamus proceeding the trial court "inquir[es] into the validity of any final administrative order or decision made as the result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken, and discretion in the determination of facts is vested in the inferior tribunal, corporation, board, or officer." (§ 1094.5, subd. (a); see *JKH Enterprises, Inc. v. Department of Industrial Relations* (2006) 142 Cal.App.4th 1046, 1056, fn. 9 [48 Cal.Rptr.3d 563], (*JKH Enterprises*).)

The trial court's "inquiry in such a case shall extend to the questions whether the respondent has proceeded without, or in excess of jurisdiction; whether there was a fair trial; and whether there was any prejudicial abuse of discretion. Abuse of discretion is established if the respondent has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (§ 1094.5, subd. (b).)

"Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record." (§ 1094.5, subd. (c).)[11]

"This language [in subdivision (c) of section 1094.5] does not attempt to specify which cases are reviewable under which standard. 'The sole legislative guidance on this point is that the courts may independently weigh the

---

[11] Under the substantial evidence test, courts do not reweigh the evidence. They determine whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to an administrative order or decision or a court's judgment, will support the administrative or judicial findings of fact. Administrative and judicial findings are presumed to be supported by the record; and orders, decisions and judgments are presumed to be correct. Persons challenging them have the burden of showing that they are not supported or correct. (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1062; *Booth v. Robinson* (1983) 147 Cal.App.3d 371, 377 [195 Cal.Rptr. 130]; *Robinson v. Pediatric Affiliates Medical Group, Inc.* (1979) 98 Cal.App.3d 907, 910 [159 Cal.Rptr. 791]; *Hosford v. State Personnel Bd.* (1977) 74 Cal.App.3d 302, 306–307 [141 Cal.Rptr. 354].)

evidence whenever "authorized by law" to do so. In using this language, the Legislature simply intended to codify existing rules governing the applicable standard of judicial review. [Citation.] In other words, the courts are left with the ultimate task of deciding which cases warrant such review. [Citations.]' (*County of Alameda v. Board of Retirement* (1988) 46 Cal.3d 902, 906 [251 Cal.Rptr. 267, 760 P.2d 464].)" (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1057, fn. 10.)

■ When an administrative order or decision does not involve or substantially affect a fundamental vested right of the person challenging that decision or order, the substantial evidence test is applied by the trial court in a section 1094.5 review. (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1057.) Determination whether a right is fundamental and vested is made on a case-by-case basis. (*Id.* at p. 1059.) A vested right can be found to be fundamental, and thus require a trial court's independent judgment review, on the basis of one or both of the following factors: "(1) the character and quality of its economic aspect; (2) the character and quality of its human aspect." (*Interstate Brands v. Unemployment Ins. Appeals Bd.* (1980) 26 Cal.3d 770, 780 [163 Cal.Rptr. 619, 608 P.2d 707].) "The ultimate question in each case is whether the affected right is deemed to be of sufficient significance to preclude its extinction or abridgement by a body lacking *judicial* power." (*Id.* at p. 779, fn. 5.)

■ "Even though the fundamental vested right determination is made on a case-by-case basis, as a general rule, when a case involves or affects purely economic interests, courts are far less likely to find a right to be of the fundamental vested character. [Citations.]" (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1060.) Thus, " '[a]dministrative decisions which result in restricting a property owner's return on his property, increasing the cost of doing business, or reducing profits are considered impacts on economic interests, rather than on fundamental vested rights.' (*E.W.A.P., Inc. v. City of Los Angeles* (1997) 56 Cal.App.4th 310, 325, 326–327 [65 Cal.Rptr.2d 325] . . . .)" (*Id.* at p. 1061.)[12]

---

[12] *JKH Enterprises* is of particular interest in this appeal because it involved a section 1094.5 challenge to an administrative determination that a courier service business was required to provide workers' compensation insurance for the benefit of its delivery service drivers, who the business had asserted were really independent contractors, not employees. In upholding the trial court's application of the substantial evidence test rather than the independent judgment test, the *JKH Enterprises* court stated that (1) the case "involves agency regulation of labor relations and the enforcement of legislated social policies"; (2) "the purpose of the [administrative] decision was to impose JKH's compliance with the law as a condition of doing business, not to put it out of business"; and (3) "[e]ven if [it] were the case [that JKH would be put out of business if required to provide workers' compensation insurance for its drivers], the continued operation of a business in a manner that violates the applicable regulatory scheme governing all employers is not a fundamental vested right or one that was legitimately

b. *Standard of Appellate Review*

The nature of an issue on appeal determines the appellate court's standard of review in an administrative mandamus case. Questions of law and issues regarding the nature or degree of an administrative penalty are given a de novo review, the latter being examined to determine whether the administrative agency abused its discretion. (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1058, fn. 11.)

In examining the findings in a section 1094.5 case, reviewing courts apply the substantial evidence test. That test is applied to *the trial court's findings* if a fundamental vested right is involved or substantially affected and the trial court exercised its independent judgment in examining the administrative decision. (*Bixby v. Pierno* (1971) 4 Cal.3d 130, 143, fn. 10 [93 Cal.Rptr. 234, 481 P.2d 242].) On the other hand, if no fundamental vested right presents in the case and the trial court applied the substantial evidence test, then the reviewing court's task is the same as the trial court's—examination, under the substantial evidence test, *of the administrative agency's findings*. (*JKH Enterprises, supra*, 142 Cal.App.4th at p. 1058.) When an appellate court examines the administrative findings and determines they are supported by

acquired. It is true that requiring JKH to purchase workers' compensation insurance would mean that it would have to incur an expense, and that this expense would cause an increase in the cost of doing business and potentially a decrease in profits. But this result would affect a purely economic interest and would not involve or affect a right that is fundamental and vested . . . ." (*JKH Enterprises, supra*, 142 Cal.App.4th at pp. 1061–1062.) That analysis by the *JKH Enterprises* court is applicable to the instant case and validates the trial court's use of the substantial evidence test when it decided AVP's challenge to the Commissioner's decision that AVP's carriers are employees for purposes of workers' compensation insurance.

We reject AVP's contention that the court's analysis in *JKH Enterprises* is flawed. AVP asserts that *JKH Enterprises* did not "consider fully" the decision in *Interstate Brands v. Unemployment Ins. Appeals Bd.*, *supra*, 26 Cal.3d 770, 773, 775, where the Supreme Court had affirmed the trial court's determination that certain of the employees of Interstate Brands were not entitled to unemployment insurance benefits, and held that it was proper for the trial court to apply the independent judgment test in reviewing the evidence produced at an adminstrative hearing because the case affected a fundamental vested right of the employer. We note that the Supreme Court denied review in *JKH Enterprises*. We also note that the *Interstate Brands* court did not address the question whether the subject workers were employees or independent contractors. Their employee status was admitted by Interstate Brands. However, *Borello* did address that issue, and there the Supreme Court simply stated that "[t]he determination of employee or independent-contractor status is one of fact if dependent upon the resolution of disputed evidence or inferences, and the [administrative agency's] decision [on that status issue] must be upheld *if substantially supported*." (*Borello, supra*, 48 Cal.3d at p. 349, italics added.) The *Borello* court did not state whether the question of worker status involves or affects a fundamental vested right. As noted in footnote 13, *post*, the evidence in this case is disputed. Therefore, in deciding this appeal in favor of upholding the Commissioner's decision that the carriers are employees and not independent contractors for purposes of workers' compensation insurance, we did so by addressing the question whether that decision is substantially supported by the evidence in the administrative record.

substantial evidence, the court then determines whether those findings support the administrative order or decision. (*Topanga Assn. for a Scenic Community v. County of Los Angeles* (1974) 11 Cal.3d 506, 514–515 [113 Cal.Rptr. 836, 522 P.2d 12].)

No fundamental vested right is involved or substantially affected in the instant case. The case before us involves a dispute over the "employee" status of a newspaper publisher's carriers and whether the publisher should be liable for workers' compensation insurance premiums. This is clearly an economic issue stemming from social policies regarding labor relations. Therefore, we apply the substantial evidence test to the administrative findings, just as the trial court did.

### 2. Workers' Compensation Law

■ Workers' compensation benefits extend to employees for injuries they sustain that arise out of and in the course of their employment. (Lab. Code, § 3600.) The term "employee" does not include independent contractors. Any characterization by persons as to whether one of them is an employee of the other or an independent contractor is not dispositive of that issue for workers' compensation purposes. Moreover, workers' compensation law is liberally construed for the purpose of providing benefits to persons injured in their employment, and there is a general presumption that someone who provides services to another is an employee covered by that law. Thus, one who asserts that a person who provides services to him or her is not entitled to workers' compensation benefits has the burden of proving that such person is an independent contractor. (*Borello, supra*, 48 Cal.3d at pp. 349, 354.)[13]

■ Section 3353 of the Labor Code defines an independent contractor as "any person who renders service for a specified recompense for a specified result, under the control of his principal as to the result of his work only and not as to the means by which such result is accomplished." Thus, the right of the person to whom services are rendered to control the manner and means of accomplishing the desired result of those services is a significant factor for determining whether the person performing the work is an employee or an independent contractor. However, many other factors are also examined. (*Borello, supra*, 48 Cal.3d at p. 350.)

---

[13] In *Gonzalez v. Workers' Comp. Appeals Bd.* (1996) 46 Cal.App.4th 1584, 1593 [54 Cal.Rptr.2d 308] (*Gonzalez*), the court stated that when the evidence is undisputed, the issue of a person's status as an employee or an independent contractor is one of law (but deference to the administrative agency's view is appropriate). De novo review is not appropriate in this case for at least the reason noted in footnote 9, *ante*. The evidence regarding the negotiability of the rates, charges and fees paid to and by the carriers under their contracts did not match the parties' stipulation regarding rates, charges and fees.

■  The additional factors include (1) the right to discharge at will, without cause; (2) whether the person performing the services is engaged in a distinct occupation or business; (3) whether such person has made a substantial investment in his or her business, other than his or her services; (4) whether that person is the one that is best situated to distribute the risk and cost of injury as an expense of doing business; (5) whether the work, in the given locale, is usually performed under the supervision of a principal; (6) the skill required in the occupation; (7) whether the remuneration given to the person providing the services depends on his or her initiative, judgment or managerial abilities; (8) whether the principal or the worker supplies the tools, equipment and place of work; (9) the length of time that the services will be performed; (10) whether payment is by the job or by a unit of time; (11) whether the work is part of the principal's regular business; (12) whether the person performing the services hires his or her own workers; and (13) whether the parties believe they are operating in an employer-employee relationship. (*Borello, supra,* 48 Cal.3d at pp. 350–355.)

These additional factors and their import are generally viewed not as separate tests but rather as they combine in the individual case, and with reference to the protective, social purpose of workers' compensation law. (*Borello, supra,* 48 Cal.3d at pp. 351–354.) Thus, our review of the evidence in this case is not concerned with whether each and every one of the factors indicate an employee status for the carriers. Nevertheless, the evidence does show that nearly all of the factors point to the carriers being employees and not independent contractors.

3.  *Substantial Evidence Supports the Administrative Findings and
    Decision in This Case*

In analyzing the evidence in this case under the substantial evidence test, we will first address the question whether AVP's relationship with its carriers gives it the right to control the manner and means by which the carriers accomplish their tasks. Although the form contract between AVP and the carriers states that each carrier "has the right to control the manner and means of delivery" of AVP's publications and "has the right to determine the equipment and supplies needed to perform delivery services," there is substantial evidence that is not actually the case.

The pages of the form contract are filled with manner and means provisions regarding the task of delivering AVP's publications, as well as detailed negative consequences to the carriers if they do not comply with those manner and means directives. By way of example, carriers are required to bag certain of the publications, and to use specific colors in doing so. AVP permits its customers to dictate where they want the publications placed on

their property. Any harm to, or loss of, the papers can result in financial loss to the carrier. The carrier must abide by the pickup and delivery times specified in the contract, or face economic consequences. In addition to the financial penalties imposed for failure to abide by these many dictates, failures are also grounds for termination for cause. The use of the many financial penalties, as well as reports of complaints of customers, and the visual surveys to determine whether red and orange bagged papers have been delivered, enable AVP to maintain significant supervision over the carriers. Moreover, AVP has control over the price paid by customers to AVP, which includes both the cost of the newspaper and the delivery service. While it is true that carriers can choose the sequence of their delivery, the vehicle they use to make deliveries, whether and when to take breaks, and the clothes they wear during their deliveries, those choices are, in reality, a function of the weather, the size and density of their routes, and whether they can afford to have a vehicle for deliveries separate and apart from a vehicle for their own personal use.[14]

We also note that under several provisions of the contract, the carrier is responsible for procuring new subscribers to the Press. The contract states the carrier is to (1) use his or her best efforts to procure as many new subscribers as possible, (2) make every good faith effort to solicit subscriptions, and (3) maintain or increase the number of home subscribers on his or her route. Indeed, a decrease in subscribers on a carrier's route of more than 2 percent gives AVP the right to terminate the carrier's contract. However, there is no indication that persons who work in AVP's circulation department and have procurement of new subscribers as one of their tasks are not considered employees by AVP.

Substantial evidence also supports the ALJ's finding that most of the additional factors adopted by the *Borello* court indicate an employer-employee relationship between AVP and its carriers. Regarding the right to discharge at will without cause, that right is clearly given to AVP under the terms of the contracts. Only a 30-day written notice to the carrier is required; and, more than one complaint per month "per one thousand contracted subscriber deliveries per edition (paid, free sample, or TMC, or other)" can result in immediate termination for cause. Also, the evidence does not show that in making deliveries for AVP, the carriers are engaged in a distinct occupation or business of their own. There was no evidence that any of AVP's carriers hold themselves out as being an independent delivery service

[14] Although the language of the contracts shows that AVP intended for the carriers to believe they have an independent contractor relationship with AVP, it was not clear to the ALJ that the carriers fully understood what such a relationship would mean for themselves. Moreover, the ALJ found that the carrier-witnesses at the administrative hearing "appeared to appreciate the 'notion' of 'being their own bosses,' without fully understanding whether the [contracts] in fact accomplished this."

that happens to have AVP as one of its customers. Further, AVP does not cite evidence showing that the carriers have a substantial investment in their AVP delivery duties other than their time and the vehicles they use; and their vehicles are not shown to be other than the vehicles they use for their own personal activities.

Additionally, the evidence does not demonstrate that the carriers are the contracting parties best situated to distribute the risk and cost of an on-the-job injury as an expense associated with delivery of AVP's publications. Evidence shows that 62 of the 170 carriers that had earnings from AVP in 2003 were between the ages of 19 and 29, and 56 of those 62 carriers earned less than $10,000 that year. Indeed, 130 carriers earned less than $10,000 that year. Only 30 carriers earned between $10,000 and $19,000, and only 10 carriers earned more than $20,000. After they pay their gasoline and car maintenance expenses associated with delivering AVP's publications, the carriers are even less able to distribute the risk and cost of injury as an expense of doing business. Indeed, the very concept of *distributing* the risk and cost of injury as a business expense necessarily requires that the carriers have other sources of business income which can be tapped for payment of health and income insurance premiums to cover potential on-the-job injuries to themselves. Yet, there was no evidence that any of the carriers have a delivery business through which they can distribute that risk and cost. In contrast, as a means of paying for workers' compensation insurance, AVP has the ability to make adjustments in the prices it charges the public for its publications and for advertising in those publications.

There are other factors that indicate the carriers are employees. Delivering papers requires no particular skill. A carrier's remuneration is in very large part dependent on nonnegotiated financial terms in the contract rather than on the carrier's initiative, judgment or managerial abilities. AVP supplies many of the materials used by the carriers (the newspapers, the mandatory orange and red plastic bags, the subscriber lists), as well as facilities the carriers use, like the loading docks for pickup of AVP's publications and assembly of the various parts of the Press. The length of a carrier's service is at least 12 months by contract, and evidence shows that, of the 170 carriers who earned money working for AVP in 2003, 49 of them had begun working by 2002, and 25 of those 170 carriers signed their first contract with AVP in the 1990's. Thus, the notion that an independent contractor is someone hired to achieve a specific result that is attainable within a finite period of time, such as plumbing work, tax service, or the creation of a work of art for a building's lobby, is at odds with carriers who are engaged in prolonged service to AVP.

Closing out our review of the factors to be considered when an issue of a worker's status arises, we note that payment for the carriers is essentially in a

piecework fashion, like turning out dresses for a clothing manufacturer, with a certain number of papers needing to be delivered each day. Moreover, delivery of AVP's publications to homes, retail stores, and newspaper vending machines is part and parcel of the newspaper business. Indeed, there was evidence that AVP has "admitted employees" who make deliveries of its publications. Also, although the contract states a carrier has "the right to hire employees of his/her choosing and to [c]ontract with others to fulfill [the carrier's] obligations under this Contract," that right is qualified in several respects by the contract. The contract states the carrier can "hire employees and substitutes when [the carrier] deems it necessary." The contract mandates that "the receipt, transportation, distribution and delivery by [the carrier] of copies of newspapers shall be made only in vehicles under [the carrier's] control and direction." And the contract forbids the carrier from "disclos[ing] in any form to any other person any subscriber list, non-subscriber list, customer list, or route records."

Thus, we necessarily conclude that, despite the carriers having signed contracts that purport to decide they function as independent contractors rather than employees, substantial evidence supports the administrative findings and decision that they are employees of AVP. Moreover, we cannot help but notice the similarity between this case and *Gonzalez, supra,* 46 Cal.App.4th 1584, which concerned a newspaper route carrier who was injured in a traffic accident while making his newspaper deliveries. Prior to the injury, the carrier and the newspaper company had entered into a contract entitled "Independent Carrier Agreement" which stated, among other things, that the carrier's status was that of an independent contractor and not an employee. After the injury, the newspaper company asserted the carrier was an independent contractor and denied the carrier's claim for workers' compensation benefits. The *Gonzalez* court found that the totality of the circumstances in the case regarding the contracting process and the rights and functions of the carrier and the newspaper in their relationship with each other demonstrated that the contract the carrier was required to sign was simply a subterfuge used by the newspaper to avoid workers' compensation law. The *Borello* and *JKH Enterprises* courts also determined that the workers in those cases were employees despite their having signed agreements (migrant farmworkers in *Borello*) or other writings (delivery service drivers in *JKH Enterprises*) that stated they are independent contractors.[15]

---

[15] There is no merit to AVP's contention that Labor Code section 4157 supports its claim that the carriers are independent contractors. That statute is part of the Labor Code provisions that permit employers, and persons in their employ who are not otherwise entitled to workers' compensation benefits, to mutually elect to be subject to workers' compensation law. (Lab. Code, § 4150 et seq.) Section 4157 states: "Where any employer has made an election pursuant to this chapter to include under the compensation provisions of this division an independent

## *DISPOSITION*

The judgment from which AVP has appealed is affirmed. Costs on appeal to the Commissioner and State Fund.

Klein, P. J., and Kitching, J., concurred.

A petition for a rehearing was denied May 30, 2008, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 13, 2008, S164242.

---

contractor engaged in vending, selling, offering for sale, or delivering directly to the public any newspaper, magazine, or periodical, the status of such person as an independent contractor for all other purposes shall not be affected by such election."

Labor Code section 4157 speaks for itself. Explicitly it recognizes that independent contractors who vend, sell, offer for sale or deliver newspapers, magazines or periodicals can be covered under workers' compensation law, but they retain their independent contractor status for all other purposes. Implicitly it recognizes that people *can be* independent contractors when they engage in those activities. Nothing in section 4157 rises to an assertion by the Legislature that all persons so engaged are *necessarily* independent contractors.