Filed 2/10/14 Taylor v. City and County of San Francisco CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MAIDA B. TAYLOR,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO et al.,<br><br>　　　Respondents;<br><br>YIN KWAN TAM et al.,<br><br>　　　Real Parties in Interest and Respondents. | A136523<br><br>(San Francisco County<br>Super. Ct. No. CPF-11-511507) |

This appeal contests the determination of the City and County of San Francisco (City) that the construction of three new homes is categorically exempt from review under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). Appellant Maida B. Taylor argues that the project is not exempt because it entails more than construction of three new homes, falls within exceptions to the exemption, and improperly relies on mitigations of environmental impacts. We conclude that Taylor's contentions lack merit, primarily because she has failed to show that the project will have any adverse effect on the environment. We therefore affirm the denial of her petition for writ of mandate.

## I. BACKGROUND

The developers, Yin Kwan Tam, et al. (hereafter collectively and severally Tam) acquired lots 116 and 117 at the southwestern corner of Los Palmos Drive and Foerster

1

Street in the Miraloma Park neighborhood of the City in February 2007. Lot 117 is approximately 5,360 square feet and encompasses a single-family home, constructed in 1950, with the address of 795 Foerster. Lot 116 is approximately 3,930 square feet and is vacant. Tam applied in May of 2008 for permission to subdivide the properties into four lots, and for permits to build one single-family home on each of the three new vacant lots, with addresses on Los Palmos. Tam applied in July 2008 for a determination that the project was exempt from environmental review.

In June 2009, the City Planning Department determined that the project was categorically exempt from review under CEQA. In September 2009, the City's Department of Public Works approved a tentative parcel map for the subdivision. The subdivision approval was appealed to the City Board of Supervisors (Board). The Board rejected the appeal and approved the map on October 5, 2010. On October 7, 2010, the City's Department of Building Inspection issued permits for construction of the three new homes on Los Palmos.

In January 2011, the Miraloma Park Improvement Club (MPIC), an organization of residents in the neighborhood, appealed the CEQA exemption determination to the Board. The Board rejected the appeal at a meeting in March 2011. In August 2011, Taylor and three other individuals filed a petition for writ of mandate to overturn the Board's decision on the CEQA exemption. The petition was summarily denied and this appeal ensued.

## II.  DISCUSSION

A.  Scope of the Project

The City determined that the project qualified for a "Class 3" exemption under the CEQA Guidelines for "construction and location of limited numbers of new, small facilities or structures." (Cal. Code Regs., tit.14, § 15303; the CEQA Guidelines in Cal. Code Regs., tit.14, § 15000 et seq. are hereafter cited as Guidelines.) Class 3 exempts "[o]ne single-family residence, or a second dwelling unit in a residential zone. In urbanized areas, up to three single-family residences may be constructed or converted . . . ." (Guidelines, § 15303, subd. (a).) Taylor contends that the project is not

2

exempt under class 3 because it consists of more than the construction of three new single-family homes. She argues that the project is of greater scope because it also includes removal of a rear bedroom at 795 Foerster, and subdivision of the property into four lots.[1]

Removal of the rear bedroom is allegedly part of the project because, according to Taylor's briefing, "the existing structure at 795 Foerster would have bisected the property line between the three new development lots and the fourth existing lot." However, removal of the bedroom could not be part of the project if it was done by a prior owner before Tam took title to the property, and conflicting evidence was presented on this point in the CEQA appeal to the Board. The MPIC presented an aerial photo purporting to show the bedroom on February 19, 2007, the day before Tam took title. In response, Tam filed a declaration under penalty of perjury stating that "[n]one of the owners caused a portion of the existing building's rear to be removed."[2] At the hearing before the Board, Taylor said that she obtained the February 19, 2007 photo from "eMap, which is a vendor for a digital globe." Planning Department staff took the position before the Board that "the appellant has not provided any credible evidence that [t]he existing residence on the project site was altered by the current owner."

Taylor maintains that the City "did not rely on substantial evidence to reach the unfounded conclusions that the construction was completed on 795 Foerster Street 'prior' to [Tam] taking possession of the site. In fact, the overwhelming evidence is the opposite." This "overwhelming" evidence Taylor refers to consists of the purported February 19, 2007 photograph, and Tam's permit application to repair dry rot on the back

---

[1] Taylor's opening brief also identifies "demolition and reconstruction of a retaining wall running the length of the new parcels on the southern property line border at 795 Foerster," and "a rear yard variance for a reduced minimum rear yard for the new lot created at 795 Foerster" as parts of the project. However, the tentative parcel map was adjusted in December 2009 to eliminate the need for the variance and, by the time of CEQA appeal to the Board, Tam agreed to keep the existing retaining wall.

[2] In 2010, Tam applied for and was granted a permit to retroactively "legalize removal of existing rear portion of the building on 1st floor done by previous owner."

wall of 795 Foerster in April 2007, shortly after Tam acquired the property. But the accuracy of the photo is not self-evident, and the permit application is inconclusive.

Taylor denigrates Tam's declaration stating that the developers did not remove the bedroom as "self-serving," but the date of the photo is based on equally "self-serving" representations by the MPIC in briefing the appeal to the Board, and Taylor's testimony before the Board, as to that date. The permit application for the dry rot repair stated that the problem was on the "wall in one room where the place is close to the rear yard section (approx. 20 sf). If we face to property that should be at right side at rear section close to yard." Taylor asserts that the room with the dry rot must have been the bedroom allegedly removed by Tam after purchase of the property, but neither the pre-1999 map nor the current photo she cites for that assertion conclusively show this to be the case. The room "close to [the] yard" could also have been one at the back of the structure after the bedroom was removed.

Taylor argues: "[Tam's] and the City's position is that just prior to the sale, the former owner, for completely unexplained reasons, suddenly removed the addition at the rear of the property. This is incredibly fortuitous for the developers because otherwise this Project could not have gone forward, at all with the categorical exemption. Obviously, this version of events is not credible." Taylor does not cite to anything in the record that would demonstrate the bedroom was "suddenly" removed "just prior to the sale," or that the prior owner had no good reason to remove it. In any event, the City could choose to credit Tam's declaration that the developers did not remove it even if, as Taylor claims, "the weight of the evidence in the record" put the declaration in doubt. "Under the substantial evidence test, courts do not reweigh the evidence." (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 849, fn. 11.) Contrary to Taylor's claim, the City had substantial evidence from which it could find that the project did not involve removal of the bedroom.

Nor did the subdivision of the property expand the project beyond the categorical exemption for the construction of three new homes. In response to the City's argument that the present appeal is untimely because its gravamen is a challenge to the subdivision

4

of the lots, not the construction of the homes,[3] Taylor concedes that "there is no colorable claim stated against the subdivision itself," and that she "does not challenge any aspect of the subdivision." Rather, as she repeatedly emphasizes, her contention is that subdividing the lots takes the project beyond the exemption because the exemption is for three homes and the subdivision creates "*four* new development lots" on the property. But this mischaracterizes the City's action. The subdivision approval creates three lots that are new, and reconfigures the existing lot at 795 Foerster. The creation of the three new development lots does not exceed the exemption because the exemption permits construction of up to three homes on any "legal parcel." (Guidelines, § 15303.) The project here builds three homes on three parcels that Taylor concedes are "legal."

B. <u>Unusual Circumstances Exception</u>

Taylor argues that the project is excepted from the class 3 categorical exemption under Guidelines section 15300.2, subdivision (c), which provides: "A categorical exemption shall not be used for an activity where there is a reasonable possibility that the activity will have a significant effect on the environment due to unusual circumstances." The unusual circumstance Taylor alleges is the property's location "directly in the path of and on the fill created by San Francisco's only fatal landslide."

A party challenging an agency's exemption decision has the burden of proving that the project has the potential to cause a substantial adverse environmental impact. (*Assn. for Protection of Environmental Values in Ukiah v. City of Ukiah* (1991) 2 Cal.App.4th 720, 728 (*Ukiah*). There is a split of authority on the proof required. (*Robinson v. City and County of San Francisco* (2012) 208 Cal.App.4th 950, 957.) Some courts hold that a party contesting the exemption must produce substantial evidence showing a reasonable possibility of an adverse environmental impact. (*Ibid*.) Other courts require substantial evidence supporting merely a "fair argument" for that possibility. (*Ibid*.) We assume for purposes of this opinion that the fair argument

---

[3] In view of our other conclusions, we need not reach this argument.

5

standard applies, and conclude there is no substantial evidence for such an argument in this case.

(a) Record

When the City determined in 2009 that the project was categorically exempt, it stated that the project would have no significant effects on archeological or biological resources, and it "could not result in a significant environmental effect with respect to geotechnical matters." The geotechnical finding was based on two reports Tam submitted: a May 26, 2008 report by Earth Mechanics Consulting Engineers (2008 report); and an April 7, 2009 report by Trans Pacific Geotechnical Consultants, Inc. (2009 report).

The 2008 report concluded that "the site is suitable for support of the proposed improvements." The report addressed the potential for a landslide at the site as follows:

"The geologic map for the area prepared by Bonilla (1998) shows a landslide deposit underlying the southwest portion of the subject site. The mapped landslide deposit originates upslope of the subject site about 2 blocks and terminates downslope of the subject site near the intersection of Foerster Street and Melrose Avenue. This mapped feature crosses Stanford Heights Avenue and Los Palmos Drive upslope of the subject site, and encompasses dozens of existing residences. We performed a reconnaissance of the area and did not observe evidence of active landslide movement in the streets or existing residences within the mapped landslide deposit. Based on our observations, it is our opinion that the landslide deposit is not active, and the landslide deposit has not experienced significant movement since the streets and residences have been built over the mapped landslide debris.

"A Seismic Hazard Zones map prepared by the California Division of Mines and Geology for the City and County of San Francisco (CDMG, 2000) indicates that the southwest portion of the subject site lies within an area of potential earthquake-induced landsliding. These areas are described as locations where previous occurrence of landslide movement, or local topographic, geological, geotechnical and subsurface water conditions indicate a potential for permanent ground displacements such that mitigation

6

would be required.  It is our opinion that the reason the southwest portion of the subject site and adjacent areas are included in the seismic hazard map is because of the mapped landslide deposit and that the topographic features in the site vicinity may indicate a future potential for permanent ground displacements.  We concur that based on the topographic features in the site vicinity, that there is a potential for ground displacements. However, we judge that the potential for damage to the proposed improvements is relatively low.  The reader should note that there is some risk of ground displacements on most hillside sites throughout the San Francisco Bay area.

"It is our opinion that the planned improvements will reduce the potential for ground displacements by improving site drainage and by adding rigidity within the slope with the proposed structural improvements."

The 2008 report included recommendations for the design and construction of the project, including:  "site preparation and grading; seismic design; appropriate foundation; retaining walls; slab-on-grade floors and exterior flatwork; site drainage; and maintenance."

The 2009 report updated a report that the same consultants had prepared for a prior owner of the property in 2003, and "respond[ed] to the neighbors' concerns regarding the mud flow which occurred in the block bounded by Foerster Street and Los Palmos Drive in 1942," stating:

"The mud flow appears to have originated uphill at Bella Vista Way during construction grading for new roads on the southeastern slope of Mount Davidson.  It was reported that the mud flow was one-half mile long and 10 feet to 20 feet deep.  A resident was killed during this incident, and the 700 block of Foerster Street was reportedly buried in mud.  [¶] In a photograph apparently taken shortly after the mud flow in 1942, the existing house located at 785 Foerster Street, which is immediately adjacent and south of 795 Foerster Street, was not damaged by the mud flow and remained standing.  There was no structure on the site now known as 795 Foerster Street.  In a photograph taken on

7

February 6, 1942, two houses on Foerster Street slid off their foundations into Foerster Street, and were destroyed by the mud flow."[4]

This 2009 report, like the 2008 report, included design and construction recommendations, and concluded that "from a geotechnical engineering standpoint . . . the proposed lot subdivision and housing construction may be developed as planned."

In connection with the CEQA appeal to the Board, the MPIC submitted a report from Kamal Obeid, a civil and structural engineer, that was critical of both geotechnical consultants. Obeid's work was "limited to determining if the codes and the proper standard of care are adequately applied to the evaluation of the slide hazards present at the subject site." He observed that at least a portion of the project site "is mapped on the California Division of Mines and Geology . . . Seismic Hazard Study Zone (SHSZ) maps."[5] Obeid stated that SHSZs include areas where landslides have previously occurred, and he faulted the 2008 report for failing to "include any study of the slide such as mapping the slide, providing geologic sections and slope stability analyses. It also does not include any recommendations for soil active lateral loads due to creep or slide for the foundation design." Obeid faulted the 2009 report for failing to "mention or render [an] opinion about the SHSZ."

Obeid also criticized the consultants and the City for failing to follow regulations under the Seismic Hazards Mapping Act (Pub. Resources Code, § 2690 et seq.), which provide that a project in an SHSZ zone "shall be approved only when the nature and severity of the seismic hazards at the site have been evaluated in a geotechnical report and appropriate mitigation measures have been proposed." (Cal. Code Regs., tit. 14, § 3724, subd. (a).) The regulations further provide that, "[p]rior to approving the project, the lead agency shall independently review the geotechnical report to determine

---

[4] The administrative record includes an additional report, dated April 8, 2009, by the authors of the 2009 report that provides further information about the 1942 landslide, but it is unclear whether the City considered that other report in ruling on the exemption.

[5] The City advises that Seismic Hazard Study Zones are now called Seismic Hazard Zones, but we will retain the SHSZ acronym for such zones as used in the administrative record.

the adequacy of the hazard evaluation and proposed mitigation measures and to determine that the requirements of section 3724 (a) above, are satisfied. Such reviews shall be conducted by a certified engineering geologist or registered civil engineer, having competence in the field of seismic hazard evaluation and mitigation." (*Id.*, subd. (c).)

According to Obeid, California Geological Survey's Special Publication 117A (SP 117A) "is used by Engineers and Engineering Geologists as a 'Standard of Care' for evaluating sites in the SHSZ." SP 117A "describes the methodology that is recommended for the 'Analysis of Earthquake-Induced Landslide Hazards.' " "If active landslides are identified or suspected," a "detailed . . . investigation[]" is required, which should "generally include site specific mapping of the slide as well as establishing geologic cross sections showing soil profiles that would then be used to conduct slope stability analyses." SP 117A also provides guidelines for reviewing geotechnical reports, which include "an independent field reconnaissance of the site."

It was Obeid's opinion that "a full evaluation and review per the [regulations] is required. This does not appear to have been done. The [2008] report does mention and only briefly comments on the slide hazard, but does not provide the study required by the standard of care. The [2009] report, on the other hand, does not mention the SHSZ altogether. Furthermore, no independent review of the report appears to have been done. [¶] At the very least, the City should initiate an independent review study to determine if the findings in the [2008] report are acceptable or further analysis is required. The independent review must be done in conformance with SP 117A." However, Obeid did recognize that "SP 117A recommends that the Geotechnical study be either done concurrent with, before or *after* a CEQA process." (Italics added.)

At the Board meeting on the CEQA appeal, one of the authors of the 2009 report considered it "highly unusual" to have his work critiqued by someone like Obeid, who was not a geotechnical engineer. Obeid responded that he was "not render[ing] an opinion from a geotechnical standpoint. More so from a procedural standpoint . . . . [T]he important thing really is that the independent review [by the City] was not done."

9

(b) <u>Analysis</u>

Taylor contends that Obeid's report and testimony supplied substantial evidence for a fair argument for "a reasonable possibility that the [project] will have a significant effect on the environment" within the meaning of the unusual circumstances exception. (Guidelines, § 15300.2, subd. (c).) We disagree. Obeid did not identify *any* detrimental effect the project may have on the environment. His report was an "evaluation of the slide hazards present at the subject site" but neither addressed the actual extent of those hazards nor identified what must be done to abate them. As he explained to the Board, he was not opining from "a geotechnical standpoint." He was primarily concerned with "procedural," rather than substantive, matters. He merely opined that the investigations reflected in Tam's reports were incomplete in certain respects, and that the City breached a requirement to independently review those reports.

Since Obeid drew no affirmative conclusions, his report could not satisfy Taylor's fair argument burden of proof. It showed at most that further investigation by Tam's experts and the City might have revealed an adverse impact on the environment, leaving the existence of any such impact unsubstantiated. Obeid's opinion provided no substantial evidence that supported a fair argument that the project will have an adverse effect on the environment.

Moreover, Obeid's "procedural" objections were invalid on their face. He acknowledged that the additional investigations he advocated could be undertaken "after a CEQA process," thus recognizing that the further analysis did not need to be accomplished before issuance of the categorical exemption.

Obeid disclaimed any intention to critique Tam's experts from a "geotechnical standpoint," and his opinion thus presents no critique of the quality of the work those experts completed. The 2008 report's conclusion that the project would *reduce*, not increase, the risk of landslides in the area "by improving site drainage and by adding rigidity within the slope" was thus unrefuted. Obeid rendered no opinion to the contrary.

As the City observes, Obeid's report is similar in effect to a letter written by an engineering geologist in the *Ukiah* case, which raised "issues of soil stability and water

10

runoff" in connection with construction of a single-family home that was found to be categorically exempt. (*Ukiah*, *supra*, 2 Cal.App.4th at p. 734.) The geologist, like Obeid, merely advocated additional investigation. He "state[d] that it was not evident whether the footings [were] founded within stable, high quality soils or not and he state[d] that it may be prudent to excavate a small test pit or two in order to evaluate the nature of the foundation-bearing materials." (*Ibid.*) However, he "did not express an opinion that the hillside consist[ed] of unstable soil or that the foundation [was] founded on unstable soil. He merely suggest[ed] that test borings may be prudent." (*Id.* at pp. 734-735.) Thus, his opinion "[did] not conflict with [other] opinions . . . stat[ing] that no active earthquake faults exist on the property and that the foundation had been adequately engineered" and "[did] not provide an evidentiary basis for application of the [unusual circumstances] exception." (*Id.* at p. 735.)

The unusual circumstances exception is not applicable here. Taylor's other arguments for the unusual circumstances exception are that the project involves four development lots, is situated in an officially mapped hazard zone, and impermissibly relies on mitigation measures. We address this grab bag of contentions elsewhere in the opinion.

C. Mapped Hazard Exception

Taylor argues that the project is not exempt from CEQA because it "may impact on an environmental resource of hazardous or critical concern where designated, precisely mapped, and officially adopted pursuant to law by federal, state, or local agencies." (Guidelines, § 15300.2, subd. (a).) This exception recognizes that "a project that is ordinarily insignificant in its impact on the environment may in a particularly sensitive environment be significant." (*Ibid.*) There is no dispute that the property is at least partially located in a SHSZ, a "precisely mapped" area.

Taylor relies on this undisputed fact to repeatedly claim that this exception applies "by definition" because the project is within a SHSZ. At other points in her briefs, she seems to contradict her position by stating that she "is not arguing that a categorical exemption could never be awarded to <u>any</u> project found within any Seismic Hazard

Zone." To the extent that Taylor argues that location within a SHSZ automatically disqualifies a project from a categorical exemption, she is mistaken.

*Salmon Protection & Watershed Network v. County of Marin* (2005) 125 Cal.App.4th 1098 (*SPAWN*) illustrates the point. The project in *SPAWN* was construction of a home next to a creek that was "a protected anadromous fish stream and within a designated stream conservation area." (*Id.* at p. 1103.) The county conceded that the project was located in "an area of 'critical concern' of its own designation" within the meaning of the mapped hazard exception. (*Id.* at p. 1106.) However, the project's location alone did not end the inquiry. "The relevant issue [was] thus reduced to whether the project 'may impact' on that environmental resource of critical concern," and the court went on to discuss the "potential for an adverse environmental impact." (*Ibid.*)

As we observed in the preceding section of this discussion, no substantial evidence has been presented for a fair argument that the project in this case will have an adverse effect on the environment. Consequently, the mapped hazard exception, as well as the unusual circumstance exception, does not apply.

D. Cumulative Impact Exception

Taylor argues that the project is excepted from exemption due to potential cumulative impacts. (Guidelines, § 15300.2, subd. (b) [class 3 exemptions "are inapplicable when the cumulative impact of successive projects of the same type in the same place, over time is significant"].)

(a) Record

The MPIC told the Board that the project neighborhood "is filled with large lots such as the one currently proposed for development," and submitted maps depicting such lots. The MPIC stated that "[m]any of these lots are being sold as 'eligible' for multi-building development," and lodged a real estate listing for a property that said: "Check with the City of San Francisco to see if they will allow for a Multiple Family Development." The Board member representing the neighborhood recused himself from decision making on the project because "the same situation is directly behind my house.

12

There is a potential project that will be impacted, I believe, by the precedential nature of this case. . . . [I]t is an issue of neighborhood character that is going to specifically impact that project because of the foreseeability of it because of the potential material impact on my property."

City Planning Department staff responded in a memorandum to the Board that they had "reviewed permit history and planning efforts in the project vicinity and found no past, present or reasonably foreseeable future projects that would combine with the effects of the project to result in significant environmental impacts. . . . As such, the Appellant's assertion is speculative and does not constitute evidence of a reasonably foreseeable development that should be considered in a CEQA cumulative impact analysis." As for the Board member's recusal, the planning department wrote that "even if a subdivision were proposed for the lot adjacent to the Supervisor's property, such a project would be unlikely to have geologic impacts that could combine with impacts of the proposed Project, given the two properties are approximately 0.25 miles from one another." At the Board meeting on the CEQA appeal, planning department staff reported that its database and that of the Department of Building Inspection disclosed "no reasonably foreseeable projects within a two-block radius of the project site that would result in physical changes that could reasonably combine with the physical and environmental impacts of the project."

(b) Analysis

This situation here is the same as that in *Hines v. California Coastal Com.* (2010) 186 Cal.App.4th 830, where a cumulative effects argument was rejected. The project there was construction of a single-family home near a riparian habitat. Local coastal plan policy required a 100-foot riparian setback, but the owners were allowed a setback of 50 feet. As here, the county found that the project was exempt as a small-scale residential development. (Guidelines, § 15303, subd. (a).) Owners of an adjacent property objected that approval of the home would enable others "to whittle away the green space in our community." (*Id*. at p. 857, fn. 18.) They argued that the project would have cumulative effects "because there are 'at least 14 vacant lots on both sides of the riparian zone.'

13

[They] speculate that once one landowner in the development is allowed to encroach on the riparian habitat, others will want to do the same, resulting in homes being built on those vacant lots within the 100-foot riparian setback." (*Id*. at p. 857.)

This argument failed: " 'The claims are based entirely on speculation. Opinions which state "nothing more than 'it is reasonable to assume' that something 'potentially . . . may occur' " do not constitute substantial evidence "necessary to invoke an exception to a categorical exemption." [Citation.]' Moreover, having produced no substantial evidence from which it could be argued that this modest single-family home will cause an environmental impact, appellants' speculation that many others may also seek to build within the buffer zone and that the county would permit them to do so does not provide substantial evidence of significant cumulative impacts. 'When there is no substantial evidence of any individual potentially significant effect by a project under review, the lead agency may reasonably conclude the effects of the project will not be cumulatively considerable, and it need not require an EIR on this basis. [Citation.]' [Citation.]" (*Hines v. California Coastal Com., supra,* 186 Cal.App.4th at pp. 857-858.)

This reasoning applies equally here and shows why Taylor's cumulative effects argument is untenable. No adverse environmental effects have been identified with respect to Tam's project and, insofar as it appears from the evidence, the project will decrease, not increase, the risk of landslides on which Taylor is focused. There does not appear to be any risk of cumulative negative environmental effects.

E. Reliance on Mitigations

Taylor correctly observes that "a project may not 'mitigate-its-way' to a [c]ategorical [e]xemption." CEQA involves a three-step process. (*Ukiah*, *supra*, 2 Cal.App.4th at p. 725.) First, if the project is exempt by administrative regulation, no further evaluation is required. (*Id*. at p. 726.) Second, if it appears that the project may have an adverse environmental effect, a study is done to determine whether the effect may be significant and, if no such effect is apparent, a negative declaration is issued. (*Ibid*.) Third, if it appears that the project may have a significant environmental effect, an EIR is required. (*Ibid*.) Mitigations to eliminate potentially significant environmental

14

effects are evaluated in the second step of the process, when "elaborate standards—as well as significant procedural requirements," including public review, apply in "determining whether proposed mitigation will adequately protect the environment." (*Azusa Land Reclamation Co. v. Main San Gabriel Basin Watermaster* (1997) 52 Cal.App.4th 1165, 1200 (*Azusa*).) "[A]n agency should not be permitted to evade these standards by evaluating proposed mitigation measures in connection with . . . a categorical exemption." (*Id*. at p. 1201.) Thus, "proposed mitigation measures cannot be used to support a categorical exemption; they must be considered under the standards that apply to a mitigated negative declaration." (*Id*. at p. 1199.)

The City's exemption notice stated: "The sponsor has agreed to follow the recommendations of the [2008] report, specifically: drilled, cast-in-place, reinforced concrete piers of at least 14 inches in diameter extending 10 feet below grade to support proposed structures; removal of any groundwater encountered during pier shaft drilling; the use of fully backdrained retaining walls; drainage directed toward downspouts that discharge into closed conduits that drain into the site storm drain system; regular maintenance of drains and debris clearance; repair of sloughing or erosion before it can enlarge into landsliding; and planting of a dense growth of deep-rooted ground cover to minimize erosion. [¶] . . . [¶]

"The final building plans would be reviewed by the Department of Building Inspection (DBI). In reviewing building plans, the DBI refers to a variety of information sources to determine existing hazards and assess requirements for mitigation. Sources reviewed include maps of Special Geologic Study Areas and known landslide areas in San Francisco as well as the building inspectors' working knowledge of areas of special geologic concern. The above-referenced geotechnical investigation would be available for use by the DBI during its review of building permits for the site. Also, DBI could require that additional site-specific soils report(s) be prepared in conjunction with permit applications, as needed."

Taylor equates these construction specifications with mitigation measures that cannot be used to qualify the project for an exemption. However, "[a] mitigation

15

measure is designed to minimize a significant environmental impact." (Kostka & Zischke, Practice Under the California Environmental Quality Act (Cont.Ed.Bar 2d ed. 2009) § 14.6, p. 689 [citing Pub. Resources Code, §§ 21002.1, subd. (a), 21100, subd. (b)(3); Guidelines, § 15126.4, subd. (a)(1)].) Since no substantial evidence supporting a fair argument for the existence of any such impact has been presented here, there is nothing to mitigate and the construction specifications cannot be fairly characterized as mitigation measures. The cases on which Taylor relies—*Azusa* and *SPAWN*—are clearly distinguishable in this respect. In *Azusa*, "[t]here was substantial scientific evidence that continued dumping [of solid waste into a landfill] would have a significant effect on the environment." (*Azusa*, *supra*, 52 Cal.App.4th at p. 1205.) In *SPAWN*, the county found that the project "had possible 'adverse impacts on the habitat of threatened or endangered species,' and created '[p]ossible disharmonies with [a] creek' " (*SPAWN*, *supra*, 125 Cal.App.4th at p. 1108) that was "a protected anadromous fish stream" (*id*. at p. 1106).

Conditions are imposed on all residential construction to ensure that homes are properly built. If such conditions are deemed to constitute CEQA mitigation measures in the absence of evidence that a project will cause environmental harm, the exemption for small-scale residential projects would be eviscerated. This project calls for construction of three family homes in a residential area. Lot lines were adjusted to allow them to be built. The total scope of this project fits neatly within the City's declared exemption.

### III.  DISPOSITION

The judgment is affirmed.

_____
Siggins, J.

We concur:

_____
McGuiness, P.J.

_____
Pollak, J.

16