Filed 4/29/14  United Parcel Service v. Dept. of Fair Employment and Housing CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| UNITED PARCEL SERVICE, INC., | |
| Plaintiff and Appellant, | G049493 |
| v. | (Super. Ct. No. RIC 1113984) |
| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING, | O P I N I O N |
| Defendant and Respondent, | |
| EVA LINDA MASON, | |
| Real Party in Interest and Respondent. | |

Appeal from a judgment of the Superior Court of Riverside County, Gloria Trask, Judge.  Affirmed.

Paul Hastings, George W. Abele and Philippe A. Lebel for Plaintiff and Appellant.

Kamala D. Harris, Attorney General, Angela Sierra, Acting Senior Assistant Attorney General, and Michael L. Newman, Deputy Attorney General, for Defendant and Respondent.

Aarons Law Firm and Martin I. Aarons for Real Party in Interest and Respondent.

\* \* \*

Following an administrative hearing, the Fair Employment and Housing Commission (Commission)[1] ordered United Parcel Service, Inc. (UPS) to reinstate Eva Linda Mason to her position as an operations management specialist and to pay Mason damages for lost wages and emotional distress. The Commission found UPS unlawfully terminated Mason's employment in violation of the California Fair Employment and Housing Act (FEHA) (§ 12900 et seq.) because it discriminated against Mason based on a perceived physical disability and failed to take all reasonable steps necessary to prevent discrimination from occurring. (§ 12940, subds. (a) & (k).) UPS filed a petition for writ of administrative mandamus to challenge the Commission's decision and the trial court entered judgment denying UPS's petition. We affirm the trial court's judgment and conclude the Commission properly found UPS unlawfully discriminated against Mason.

UPS terminated Mason's employment under its 12-month administrative termination policy, which permits UPS to terminate employees who are unable to perform the essential functions of their regular positions for more than 12 months. UPS

---

[1] We previously granted a motion to substitute the Department of Fair Employment and Housing (DFEH) for the Commission as the respondent because the Legislature eliminated the Commission while this appeal was pending. (See Govt. Code, §§ 12903, 12930, subds. (h) & (n); Stats. 2012, ch. 46, §§ 29, 35; all statutory references are to the Government Code unless otherwise stated.) We nonetheless refer to the Commission in the body of the opinion because it is the entity that took all relevant actions and was a party in the trial court.

terminated Mason after it concluded a knee injury prevented her from performing her essential job functions for approximately 14 months. To support its conclusion, UPS relied on the medical restrictions Mason's orthopedic surgeon imposed on her without conducting an individualized assessment of Mason and her position to determine whether those medical restrictions prevented Mason from performing her essential job functions.

As explained below, the FEHA required UPS to individually assess whether Mason could perform her essential job functions before it took any adverse employment action against her. Moreover, the Commission's findings establish Mason could perform her essential job functions for approximately eight of the 14 months UPS counted toward its 12-month administrative termination policy, and Mason worked and performed her essential job functions for approximately six of those 14 months.

I

FACTS AND PROCEDURAL HISTORY

A.      *Mason and Her Operations Management Specialist Position*

Mason began working for UPS in October 1997, and became an operations management specialist in June 1998. She worked a five and one-half hour shift at UPS's Riverside warehouse. In 2007, UPS employed five operations management specialists at that facility and they worked staggered, overlapping shifts. Operations management specialists spent over 75 percent of their time on the telephone or computer responding to messages and e-mails, contacting customers, communicating with drivers, and tracking packages. They were salaried, nonunion employees who worked with and directed the hourly, union clerks who handled and advanced the packages. If a clerk was unavailable or there was an emergency, an operations management specialist might locate a package in the UPS warehouse or deliver a message to a driver, but they typically spent less than 25 percent of their time walking around the warehouse to perform these secondary functions.

3

UPS did not maintain a written job description for the operations management specialist position, but prepared a December 2005 document describing an operations management specialist's responsibilities. These tasks included: (1) "Sit continuously for the duration of the workday," up to 5.5 hours for part-time employees and up to 9.5 hours for full-time employees; (2) "Bend stoop/squat, crouch, stand and walk intermittently throughout the work day"; (3) "Perform office tasks using simple hand grasping, fine hand manipulation, and reaching associated with assigned tasks such as paperwork, typing, and/or use of a computer, filing, calculating and use of telephone"; and (4) "Lift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds."

B.      *Mason's Knee Injury and Termination*

Early in her employment with UPS, Mason suffered a knee injury when she hit her left knee on the corner of a broken file cabinet. In early June 2007, Mason experienced a series of "popping" sensations and pain in the same knee. She notified her supervisor, who referred Mason to the UPS medical clinic. The clinic doctor examined her and issued a work status report explaining Mason could return to work, but restricted her from kneeling, squatting, or using a ladder, although she could stand and walk intermittently. The doctor also referred Mason to an orthopedic surgeon, Barry Scott Grames, M.D. Based on the doctor's report, UPS classified Mason's employment status as "temporary alternative work" effective June 15, 2007, and began tracking how long she was subject to medical restrictions. Mason was unaware UPS had reclassified her work status and continued performing her regular duties.

In mid-July 2007, Grames first examined Mason and prepared a work status report explaining Mason could "[c]ontinue her usual and customary duties." He sent that report to UPS and its workers' compensation carrier, but UPS failed to remove the alternative work designation it placed on Mason. A week later, Brenda Hellerud, UPS's

4

District Occupational Health Supervisor, sent Mason an "ADA Packet" that UPS used to request medical information when an employee sought or required a reasonable job accommodation for a disability. The ADA Packet was part of UPS's 10-Step Accommodation Process for engaging employees in an interactive process to accommodate their disabilities. The cover letter explained UPS needed the medical information because Mason had "requested a job-related accommodation." Mason did not respond to the ADA Packet because she believed it did not apply to her; she had not requested a job-related accommodation and continued to perform her regular job functions after visiting the UPS medical clinic.

On August 8, 2007, Grames recommended Mason undergo arthroscopic knee surgery to repair a torn meniscus in her left knee. Based on that recommendation, Grames issued a work status report stating Mason was "temporarily totally disabled." The next day, UPS placed Mason on workers' compensation leave and designated her as on "lost time." In mid-August, Hellerud mailed a reminder asking Mason to complete and return the ADA Packet, but Mason again did not respond because she believed the packet did not apply to her.

Grames operated on Mason's knee in early October 2007. In mid-December 2007, he issued a work status report releasing Mason to return to work. Grames restricted Mason to "sedentary work only," explaining she should perform "primarily a desk job," but she could stand and walk periodically. Mason delivered Grames's report to the business manager at UPS's Riverside facility. After receiving the report, the manager decided to change the start time for Mason's shift from 7:00 a.m. to 9:00 a.m. because the facility was less congested then and he wanted to reduce the risk of Mason reinjuring her knee.

Mason returned to work on December 26, 2007, and resumed all of her regular duties as an operations management specialist, with the sole exception of walking up the steps to the warehouse's raised dock because her manager was concerned she

5

might reinjure her knee. For the first four weeks after her return, Mason used a cane, walked with a limp, and elevated her knee when it bothered her, but she performed her normal duties. Occasionally, some coworkers volunteered to help Mason by delivering messages for her.

Mike VanDamme, the business manager at UPS's Riverside facility beginning in January 2008, was unaware Mason had any medical restrictions and observed her performing her full duties as an operations management specialist. As Mason's knee continued to improve, the work status reports Grames sent to UPS and its workers' compensation carrier became progressively less restrictive. Grames's February 13, 2008 report changed Mason's work status to "limited standing and walking to tolerance," which meant she should not be on her feet for an entire shift, but she could stand and walk as tolerated. The March 19, 2008 report removed all restrictions on standing and walking, and changed Mason's work status to "limited stooping, bending and kneeling," which meant she should not perform these tasks repetitively, but she could do them intermittently throughout her shift.

Grames's work status reports generally described Mason's physical limitations and identified generic tasks she could and could not perform based on the condition of her knee, but the reports did not reconcile how those limitations affected Mason's ability to perform her job. Grames's reports offered no recommendations or opinions on whether Mason could perform the specific tasks required of an operations management specialist. At the hearing, Grames testified the limitations he placed on Mason were "subjective," meaning he left it largely to Mason to determine her limitations. During the period covered by these work status reports Mason believed she could and did perform all her regular job duties.

Upon Mason's return to work in December 2007, UPS classified her as on "residual disability." Hellerud, however, did not learn Mason was back at work until late February 2008, and did not understand how Mason was allowed to return to work when

6

she was still subject to medical restrictions. Nonetheless, Hellerud did not contact Mason or otherwise speak with anyone to learn whether Mason was performing her essential job functions.

In late March 2008, Hellerud sent Mason a letter entitled, "Nine Month Letter to Non-Union Employees on Residual Disability." The letter stated Mason had "been unable to perform the essential functions of [her job]" since June 15, 2007, and had been working on residual disability since December 2007. The letter also stated, "[A]s you consider your options, please be mindful of the Employment Status Provision of the UPS Flexible Benefits Summary Plan Description, which provides that employees who are absent from their regular occupation for 12 months (including time periods spent performing residual disability assignment) will be administratively terminated regardless of their status on [Short Term Disability] or [Long Term Disability]." Mason took no action in response to this letter. She thought it did not apply to her because she had not been absent from work and had been performing all of her duties since returning to work after her surgery.

In early April 2008, VanDamme first learned UPS had designated Mason as working on temporary alternative work and residual disability assignments because of the medical restrictions related to her knee. He did not know what the specific restrictions were and had observed Mason performing all of her regular duties. VanDamme, however, notified Mason she had run out of "modified duty" days and therefore she must either get a full release from her doctor removing all restrictions or go out on workers' compensation leave. On April 9, 2008, UPS placed Mason on workers' compensation leave because she did not have a full release. Two days later, Grames's office issued a work status report recommending that Mason "continue working modified duties with limited stooping, bending and kneeling," and "[i]f not available [Mason] will be temporarily totally disabled."

7

A few days later, Hellerud sent Mason a second ADA packet with the same cover letter explaining the packet was sent because UPS "received notification that you requested a job-related accommodation." Mason contacted Hellerud four days later, asking for the correct job description for her position because the one included in the ADA packet was incorrect. Mason called Hellerud again a few days later to inform her Grames was unavailable for a few days and she would need more time to provide the requested medical information.

On May 1, 2008, Grames's office completed the medical information form included in the ADA Packet. The completed form described Mason's treatment history and noted "she is able to perform all of her job duties" with the work restrictions of "limited stooping, bending and kneeling." Mason took the completed form to UPS's Riverside facility for delivery to Hellerud at UPS's Ontario office. Mason did not follow up to confirm the medical information form was delivered to Hellerud, and Hellerud claimed she never received it. In late May 2008, Hellerud sent a letter informing Mason that her request for a job-related accommodation had been withdrawn because Mason failed to provide the necessary medical information.

In June 2008, Grames scheduled a second arthroscopic surgery on Mason's knee. His June 11, 2008 work status report explained Mason could work with the restrictions of "limited bending, stooping and kneeling" until the date of her surgery. At the same time, Grames issued a "Work Ability Report" explaining Mason had been diagnosed with chronic left knee pain, degenerative arthritis, and bursitis, but she was able to work an eight-hour day and was "frequently" able to bend, kneel, or stoop, which meant she could do those tasks 34 percent to 66 percent of the time. Grames performed Mason's second surgery on June 26, 2008, and issued a work status report a few days later stating Mason was "temporarily totally disabled."

On August 25, 2008, UPS sent Mason a letter terminating her employment effective August 19, 2008. The letter explained, "Our records indicate that you have

8

been absent from work for more than twelve months. As a result, your employment has been administratively terminated due to the length of your absence." When she was terminated, Mason had been on workers' compensation leave since April 9, 2008.

## C. *The Administrative Proceedings*

In October 2008, Mason filed a complaint with the DFEH alleging UPS violated the FEHA by denying her reasonable accommodations and terminating her employment because of her disability. After conducting an investigation, the DFEH issued an accusation alleging UPS (1) discriminated against Mason by terminating her employment based on her disability or perceived disability; (2) failed to reasonably accommodate Mason and her disability; (3) failed to engage in a timely, good faith, interactive process with Mason to identify a reasonable accommodation; and (4) failed to take all reasonable steps necessary to prevent discrimination from occurring.

The DFEH and UPS conducted a four-day administrative hearing on the accusation before an administrative law judge. Following the hearing, the judge issued a detailed decision making factual and legal findings on the charges against UPS. On the discrimination and failure to prevent discrimination charges, the judge found UPS violated the FEHA, explaining UPS terminated Mason because it believed she was incapable of performing her essential job functions based on her knee condition, but UPS failed to conduct an individualized assessment to determine whether Mason's knee injury actually prevented her from performing those functions. On the failure to engage in the interactive process charge, the judge found UPS did not violate the FEHA because Mason's failure to respond to UPS's letters about job accommodations made her equally culpable for the interactive process breaking down. Finally, the judge found UPS did not fail to accommodate Mason's disability because Mason testified she did not require an accommodation.

9

Based on these findings, the judge ordered UPS to (1) pay Mason approximately $31,000 in lost earnings; (2) reinstate Mason to her operations management specialist position or a substantially comparable position; (3) pay Mason $25,000 in emotional distress damages; (4) pay a $10,000 administrative fine; and (5) cease and desist from discriminating against persons with disabilities and provide training to all management personnel and employees on the FEHA's requirements.

Four of five Commission members adopted the administrative law judge's decision as the Commission's final decision. The remaining commissioner agreed with most of the decision, but dissented from the finding UPS violated the FEHA by discriminating against Mason. He found the disability discrimination charge was "derivative of" the failure to engage in the interactive process charge, and Mason's failure to engage in the interactive process defeated both of those claims.

D.     *The Judicial Proceedings*

UPS petitioned for a writ of administrative mandamus seeking judicial review of the Commission's decision. After reviewing the record of the administrative proceedings, the trial court ordered the Commission to set aside the administrative fine it imposed on UPS, but otherwise upheld the Commission's decision. UPS timely appealed to challenge the Commission's conclusion UPS violated the FEHA by discriminating against Mason based on a perceived physical disability and by failing to taking reasonable steps to prevent discrimination. None of the other charges are at issue on this appeal and UPS does not challenge the Commission's remedies.

II

DISCUSSION

A.     *Standard and Scope of Review*

In an administrative mandamus proceeding, a party may challenge an administrative agency's decision on the grounds the agency acted in excess of its

10

jurisdiction, denied the petitioner a fair trial, or prejudicially abused its discretion. (Code Civ. Proc., § 1094.5, subd. (b).) "Abuse of discretion is established if the [agency] has not proceeded in the manner required by law, the order or decision is not supported by the findings, or the findings are not supported by the evidence." (*Ibid*.) The standard of review an appellate court applies depends on the nature of the challenge asserted. (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851 (*Antelope Valley*); see *Fukuda v. City of Angels* (1999) 20 Cal.4th 805, 824 (*Fukuda*).)

If the appellant challenges the evidence supporting the administrative agency's findings, the appellate court applies the substantial evidence standard of review.[2] (*Fukuda*, *supra*, 20 Cal.4th at p. 824; *Antelope Valley*, *supra*, 162 Cal.App.4th at p. 851.) We apply the de novo standard, however, if the appeal challenges only the administrative agency's legal conclusions. (*Stermer v. Board of Dental Examiners* (2002) 95 Cal.App.4th 128, 132 (*Stermer*) [if "evidence is undisputed, not subject to conflicting inferences and [review] involves only an issue of law, then we apply our independent judgment" in deciding whether the agency erred as a matter of law].)

Here, we apply the de novo standard because UPS limits its challenge to whether the Commission's findings support its decision. UPS's opening brief states it "does not challenge the [Commission's] factual findings. Rather, UPS assumes for purposes of this appeal that the Commission's findings of fact are correct, but challenges its *legal* conclusions on the basis that they are not supported by the administrative record and contravene settled law under the [FEHA]." (Original italics.)

---

[2] When a fundamental right is involved, the trial court applies the independent judgment standard to review the evidentiary support for the administrative findings, but the appellate court reviews the trial court's decision under the substantial evidence standard. (*Fukuda*, *supra*, 20 Cal.4th at p. 824.) When no fundamental right is involved, both the trial court and appellate court apply the substantial evidence standard to review the evidentiary support for the administrative findings. (*Antelope Valley*, *supra*, 162 Cal.App.4th at p. 851.)

11

Although UPS states it only challenges the legal conclusions the Commission reached, it relies on isolated pieces of evidence in the administrative record that contradict the Commission's factual findings. For example, UPS contends Mason could not perform her essential job functions, and therefore UPS could not be liable for disability discrimination as a matter of law. To support this argument, UPS cites VanDamme's testimony that some of Mason's coworkers complained she was not performing some of her job duties and he observed coworkers performing some tasks for Mason. This evidence directly contradicts the Commission's finding VanDamme observed Mason performing all of her job duties for several months and he was unaware she had any medical restrictions. We may not consider this or any other evidence that contradicts the Commission's specific factual findings because UPS expressly declared it would not challenge those findings and assumed they were correct for this appeal.

Moreover, even if we ignore UPS's concession concerning the accuracy of the Commission's factual findings, we still would refuse to consider any evidence that contradicts those findings because UPS failed to show the record does not support them. Any argument concerning whether evidence supports or contradicts a factual finding is an evidentiary challenge subject to the substantial evidence standard, not a legal challenge reviewed under the de novo standard. (*Antelope Valley*, *supra*, 162 Cal.App.4th at pp. 851-852; *Johnson Controls, Inc. v. Fair Employment & Housing Com.* (1990) 218 Cal.App.3d 517, 532.) Under the substantial evidence standard, we "presume the correctness of the administrative ruling" (*Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 419), and "view the evidence in the light most favorable to [that ruling], resolving all conflicts in the evidence and drawing all inferences in support of the [ruling]" (*Young v. Gannon* (2002) 97 Cal.App.4th 209, 225). It is not enough for an appellant to point to evidence—or even substantial evidence—that supports a different finding than the one the fact finder made; instead, the appellant bears the burden to show the record as a whole lacks substantial evidence to

12

support the challenged finding. (*Rupf v. Yan* (2000) 85 Cal.App.4th 411, 429-430, fn. 5; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2013) ¶ 8:39, p. 8-20 (rev. #1, 2013); see *Committee to Save the Hollywoodland Specific Plan v. City of Los Angeles* (2008) 161 Cal.App.4th 1168, 1182.) Here, UPS failed to provide any explanation why the record does not support the Commission's factual findings, and therefore we may not consider any evidence UPS cites to contradict those findings.

UPS contends its concession on the accuracy of the Commission's factual findings does not require us to consider only those findings in reviewing the Commission's decision. According to UPS, we are required to review the entire administrative record because the underlying material facts are undisputed and the de novo standard of review requires us to consider the legal effect of undisputed facts without regard for the Commission's findings and conclusions. Although the application of legal principles to undisputed facts is a legal question we review under the de novo standard, we reject UPS's contention de novo review requires us to look beyond the Commission's factual findings.

Here, UPS fails to recognize the only undisputed material facts are those described in the Commission's factual findings. By conceding the accuracy of those findings, UPS implicitly concedes the facts referenced in the Commission's findings are the undisputed facts to which we must apply the governing legal principles. At the administrative hearing, the underlying facts were disputed and the Commission resolved those disputes through its factual findings. For example, UPS argues Mason's inability to perform her essential job functions is an undisputed fact because some coworkers complained to VanDamme that Mason was not performing some of her job duties and he observed coworkers carrying out some of her responsibilities. VanDamme, however, also testified he saw Mason fulfilling all of her job duties and he was unaware that she had any medical restrictions. The Commission resolved the conflict between these disputed facts by finding Mason performed her essential job duties. As explained above,

13

any challenge to this or any other finding is an evidentiary challenge subject to review under the substantial evidence standard. If UPS contends the evidence required the Commission to make different or additional factual findings, UPS should have challenged the Commission's factual findings. UPS's mischaracterization of which facts are undisputed does not affect our adherence to the substantial evidence standard and the deference we must accord to the Commission's factual findings.

Accordingly, we review the Commission's decision under the de novo standard to determine whether its findings support the decision UPS unlawfully discriminated against Mason and failed to take all reasonable steps necessary to prevent discrimination from occurring.

B.    *UPS Discriminated Against Mason Based on a Perceived Disability*

1.    Governing Disability Discrimination Principles

The FEHA makes it "an unlawful employment practice . . . [¶] [f]or an employer, because of the . . . physical disability . . . of any person . . . to bar or to discharge the person from employment . . . or to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (§ 12940, subd. (a).) An employer, however, is not prohibited "from refusing to hire or discharging an employee with a physical . . . disability . . . where the employee, because of his or her physical . . . disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ." (*Id*., subd. (a)(1).)

"'California has adopted the three-stage burden-shifting test established by the United States Supreme Court for trying claims of discrimination. . . .' [Citation.] [¶] 'This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are

14

not satisfactorily explained.' [Citation.]" (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159 (*Wills*).)

"In the first stage, the plaintiff bears the burden to establish a prima face case of discrimination. [Citation.] The burden in this stage is '"not onerous"' [citation], and the evidence necessary to satisfy it is minimal [citation]. On a disability discrimination claim, the prima facie case requires the plaintiff to show 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.' [Citation.]" (*Wills*, *supra*, 195 Cal.App.4th at pp. 159-160.)

"'If . . . the plaintiff establishes a prima facie case, a presumption of discrimination arises [and]' '. . . the burden shifts to the employer to rebut the presumption by producing admissible evidence, sufficient to "raise[ ] a genuine issue of fact" and to "justify a judgment for the [employer]," that its action was taken for a legitimate, nondiscriminatory reason. [Citations.]' [Citation.]" (*Sandell v. Taylor-Listug, Inc.* (2010) 188 Cal.App.4th 297, 307-308 (*Sandell*).)

"Finally, if the defendant presents evidence showing a legitimate, nondiscriminatory reason, the burden again shifts to the plaintiff to establish the defendant intentionally discriminated against him or her. [Citation.] The plaintiff may satisfy this burden by proving the legitimate reasons offered by the defendant were false, creating an inference that those reasons served as a pretext for discrimination. [Citation.]" (*Wills*, *supra*, 195 Cal.App.4th at p. 160.)

2.      The DFEH Established a Prima Facie Case of Disability Discrimination

a.      *UPS Perceived Mason as Physically Disabled*

An employee establishes the first element of a prima facie case for disability discrimination by showing the employee suffered from a disability or the

15

employer regarded the employee as suffering from a disability. (*Wills*, *supra*, 195 Cal.App.4th at pp. 159-160.) The FEHA definition of "physical disability" includes any condition that affects the "musculoskeletal" system and "[l]imits a major life activity." (§ 12926, subd. (m)(1)(A) & (B).) A physical disability limits a major life activity "if it makes the achievement of the major life activity difficult." (*Id.*, subd. (m)(1)(B)(ii).) The term major life activity is "broadly construed and includes physical, mental, and social activities and working." (*Id.*, subd. (1)(B)(iii); *Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 345 (*Arteaga*).)

"An actual or existing disability is not necessary." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 345.) The FEHA's definition of "physical disability" includes "[b]eing regarded or treated by the employer . . . as having, or having had, any physical condition that makes achievement of a major life activity difficult." (§ 12926, subd. (m)(4).) Indeed, the FEHA declares "the Legislature intends . . . to provide protection when an individual is erroneously or mistakenly believed to have any physical . . . condition that limits a major life activity." (§ 12926.1, subd. (d); see *id.*, subd. (b) ["It is the intent of the Legislature that the definition[] of physical disability . . . be construed so that . . . employees are protected from discrimination due to an actual or perceived physical . . . impairment that is disabling, potentially disabling, or perceived as disabling or potentially disabling"].)

Here, the Commission found UPS regarded and treated Mason as physically disabled from the time she first reported her knee injury in June 2007 until it terminated her employment in August 2008. We agree. As soon as the doctor at its medical clinic examined Mason's knee and restricted her from kneeling, squatting, or using a ladder, UPS believed Mason's knee injury made the major life activity of working difficult. Starting June 15, 2007, UPS designated Mason's work status as "temporary alternative work," and later as "lost time" and "residual disability assignment," because it believed Mason's knee injury prevented her from fulfilling her

job duties. UPS ultimately terminated Mason's employment under its 12-month administrative termination policy because it believed Mason's knee injury prevented her from performing her job duties for a continuous period exceeding 12 months. Accordingly, UPS regarded and treated Mason as physically disabled.

In its opening brief, UPS does not challenge the Commission's finding that UPS perceived Mason as physically disabled. To the contrary, UPS's opening brief concedes it terminated Mason's employment because it believed "Mason was unable to perform all of the essential functions of her job for more than 12 months." (See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 48-50 (*Gelfo*) [employer judicially admitted it regarded employee as disabled by acknowledging it did not reinstate employee because it believed the medical restrictions imposed on the employee prevented him from performing his essential job functions].)

In its reply brief, UPS asserts "[c]omplying with medical restrictions imposed by a treating physician does not establish a 'perceived as disabled' claim." UPS, however, waived this argument by waiting until the reply brief to raise it. (See *Habitat & Watershed Caretakers v. City of Santa Cruz* (2013) 213 Cal.App.4th 1277, 1292, fn. 6 ["[a]rguments presented for the first time in an appellant's reply brief are considered waived"].) Moreover, this contention fails on the merits. The critical question on the first element of the prima facie case is whether UPS perceived and treated Mason as disabled. Rather than defeat the DFEH's showing on this element, UPS's purported efforts to comply with Mason's medical restrictions by designating her for alternative work assignments show UPS perceived and treated Mason differently than other operations management specialists because it believed her knee injury prevented her from working. UPS failed to cite any evidence or authority to show it did not perceive Mason as physically disabled.

17

b.      *Mason Performed Her Essential Job Functions*

An employee establishes the second element of a prima facie case for disability discrimination by showing the employee performed or could perform the essential functions of his or her job with or without reasonable accommodations.  (*Wills*, *supra*, 195 Cal.App.4th at pp. 159-160.)  This element may be broken down into two components:  (1) identifying the job's essential functions, and (2) determining whether the employee performed or could perform those essential functions with or without reasonable accommodations.

"'Essential functions' means the fundamental job duties of the employment position the individual with a disability holds or desires.  'Essential functions' does not include the marginal functions of the position."  (§ 12926, subd. (f).)[3]  "'Marginal functions' of an employment position are those that, if not performed, would not eliminate the need for the job or that could be readily performed by another employee or that could be performed in an alternative way."  (Cal. Code Regs., tit. 2, § 11065, subd. (e)(3).)  Identifying the essential functions for a particular job is a question of fact.

---

[3]      Section 12926, subdivision (f), provides further guidance for our determination by describing several key factors:  "(1) A job function may be considered essential for any of several reasons, including, but not limited to, any one or more of the following:  [¶]  (A) The function may be essential because the reason the position exists is to perform that function.  [¶]  (B) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed.  [¶]  (C) The function may be highly specialized, so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.  [¶] (2) Evidence of whether a particular function is essential includes, but is not limited to, the following:  [¶]  (A) The employer's judgment as to which functions are essential.  [¶] (B) Written job descriptions prepared before advertising or interviewing applicants for the job.  [¶]  (C) The amount of time spent on the job performing the function.  [¶] (D) The consequences of not requiring the incumbent to perform the function.  [¶] (E) The terms of a collective bargaining agreement.  [¶]  (F) The work experiences of past incumbents in the job.  [¶]  (G) The current work experience of incumbents in similar jobs."  (§ 12926, subd. (f)(1) & (2).)

(*Lui v. City and County of San Francisco* (2012) 211 Cal.App.4th 962, 971; *Hastings v. Department of Corrections* (2003) 110 Cal.App.4th 963, 967, fn. 6.)

The Commission found addressing customer complaints was the "core" and "fundamental" function of Mason's job as an operations management specialist, but the position also required her to "intermittent[ly] walk[]" around the warehouse to deliver messages and locate packages. According to the Commission, Mason's position was predominantly a sedentary, desk job because she spent more than 75 percent of her time addressing customer complaints via the telephone or computer, but the position also required Mason to spend up to 25 percent of her time walking around the warehouse. Concerning these nonsedentary tasks, the Commission found "locating packages was just an occasional task" and the hourly clerks had the responsibility to handle and advance packages because their collective bargaining agreement authorized them to file a grievance if Mason or other salaried employees performed those tasks. Accordingly, the Commission concluded "the physical handling of packages was a marginal, non-essential function of the Operations Management Specialist position."

As explained above, UPS concedes the accuracy of these findings. Nonetheless, UPS contends the essential job functions of the operations management specialist position required Mason to have the ability to "'[b]end[,] stoop/squat, crouch, stand and walk intermittently throughout the workday' and '[l]ift, lower, push, pull, leverage and manipulate equipment and/or packages weighing up to 70 pounds.'" To support this contention, UPS cites the Commission's summary of a document UPS submitted entitled, "Position: Operations Management Specialist (OMS); Essential Job Functions." UPS, however, fails to acknowledge the Commission found this document had "very little weight in establishing the fundamental job duties of the Operations Management Specialist position" because it was neither a job description nor a duty statement, and UPS did not maintain a job description for the operations management specialist position. UPS also fails to acknowledge the Commission expressly found

19

physically handling packages was a marginal, nonessential function of Mason's job and intermittently walking was the only nonsedentary task UPS identified that the Commission found to be an essential job function. We therefore reject UPS's suggestion bending, stooping, squatting, crouching, or physically handling packages or equipment were essential job functions for Mason.[4]

UPS's principal challenge to this element of the DFEH's prima facie case focuses on Mason's ability to perform the essential job functions the Commission identified. There is no dispute Mason could sit at a desk and perform the customer interaction that occupied more than 75 percent of her time at work. The dispute centers on Mason's ability to "intermittent[ly] walk[]" around the warehouse to deliver messages or locate packages. The Commission found Mason performed this job function capably with or without reasonable accommodations because Mason walked intermittently with her doctor's approval for nearly the entire period she was at work after she first reported her knee injury to UPS. During the brief period following her first surgery when her ability to walk was significantly limited, the Commission found Mason still performed this job function with the reasonable accommodation of having the hourly clerks or other coworkers voluntarily deliver messages or locate packages when Mason was unable to do so. UPS contends the Commission's factual findings do not support that conclusion, but

_____

[4]     Mason contends the Commission found *all* of her nonsedentary duties were marginal, nonessential functions. She is mistaken. The only function the Commission found to be marginal and nonessential was the handling of packages. Although the Commission did not expressly state the nonsedentary tasks of walking around the warehouse to deliver messages and locate packages were essential job functions, it also did not expressly conclude they were marginal or nonessential functions. Moreover, in analyzing whether Mason performed her essential job functions, the Commission discussed Mason's ability to walk and other workers performing nonsedentary tasks for her as a reasonable accommodation. Accordingly, viewing the Commission's decision in its entirety, it is apparent the Commission concluded Mason's essential job functions included walking around the warehouse to deliver messages and occasionally locate packages.

20

rather "establish, at most, that Mason subjectively felt she could perform all of her duties—not that she in fact was doing so—and that she did not communicate her subjective belief to anyone." (Italics omitted.) We disagree.

The Commission's findings show Mason performed her essential job duties from the time she first reported her knee injury in June 2007 until she went out on workers' compensation leave in early August 2007. The UPS doctor who first examined Mason declared she could stand and walk intermittently, which the Commission found was all Mason's job required. Moreover, Grames's initial work status report in July 2007 informed UPS Mason could "[c]ontinue her usual and customary duties."

When Mason returned to work in December 2007, the Commission found she "resumed her usual duties as an Operations Management Specialist, with the exception that [her manager] advised her not to go up onto the dock." During Mason's first three months at work after her surgery, each work status report Grames issued to UPS was progressively less restrictive. At first, he limited Mason to sedentary work with intermittent walking. A few weeks later, he changed Mason's work status to limited standing and walking to tolerance. By mid-March 2008, Grames removed all standing and walking limitations, and allowed Mason intermittently to perform limited stooping, bending, and kneeling. Throughout this period, VanDamme observed Mason performing her full job duties and was unaware she had any medical restrictions. Nonetheless, in April 2008, UPS placed Mason on workers' compensation leave despite Grames's work status reports explaining Mason could continue working under the same limitations for stooping, bending, and kneeling. UPS terminated Mason while she was out on this second leave.

These findings establish Mason performed her essential job functions of resolving customer complaints and intermittently walking around the warehouse to deliver messages and occasionally locate packages from June 15 to August 8, 2007, and from December 26, 2007, to April 9, 2008. In other words, for nearly six of the

21

14 months during which UPS designated Mason as unable to perform her essential job functions, Mason was not only capable of performing those functions, she actually performed them. Moreover, for the nearly three months she was out on her second workers' compensation leave, Mason was able to perform her essential job functions, but UPS would not allow her to do so because she did not have a complete medical release from Grames.[5]

UPS ignores these findings and instead focuses on the Commission's isolated references that Mason "felt" or "believed" she could perform her essential job functions. According to UPS, these snippets demonstrate Mason simply held a subjective belief she could perform her essential job functions but never communicated this to UPS. UPS's contention fails for two reasons. First, the findings summarized above conclusively establish Mason not only believed she could perform her essential job functions, but she actually performed those functions for a significant portion of the time UPS designated her as unable to do so. Second, whether Mason communicated to UPS her belief she could perform her essential job functions is irrelevant to this element of the DFEH's prima facie case. UPS's knowledge or understanding about Mason's capabilities do not come into play until stage two of the *McDonnell Douglas* test when we examine whether UPS had a legitimate, nondiscriminatory reason for terminating Mason's employment. This element focuses only on whether Mason could or did perform her essential job functions with or without reasonable accommodations.

_____

[5] UPS's refusal to allow Mason to continue working without a complete release is a per se violation of the FEHA because it required Mason to be 100 percent healed to continue working without considering whether she could actually perform her essential job functions. (*Gelfo*, *supra*, 140 Cal.App.4th at pp. 49-50, fn. 11 ["A policy requiring an employee to be '100 percent healed' before returning to work is a per se violation [of the FEHA] because it permits an employer to avoid the required individualized assessment of the employee's ability to perform the essential functions of the job with or without accommodation"]; see *McGregor v. National R.R. Passenger Corp.* (9th Cir. 1999) 187 F.3d 1113, 1116 (*McGregor*).)

c.      *UPS Terminated Mason Because of Her Perceived Disability*

An employee establishes the final element of a prima facie case for disability discrimination by showing the employer subjected the employee to an adverse employment action because of a disability or perceived disability.  (*Wills*, *supra*, 195 Cal.App.4th at pp. 159-160.)  Here, UPS concedes this element by repeatedly acknowledging it terminated Mason's employment because of its belief her knee injury rendered her unable to perform her essential job functions for more than 12 months.

UPS contends its decision to terminate Mason's employment on this ground does not make it liable for disability discrimination because the FEHA does not prohibit an employer from discharging a disabled employee when the employee cannot perform his or her essential job functions.  According to UPS, it reasonably and in good faith believed Mason could not perform her essential job functions because of the medical restrictions Grames placed on her, and therefore UPS cannot be liable for terminating Mason's employment.  This purported justification, however, does not change the fact UPS terminated Mason's employment *because of* her perceived disability.

Whether Mason's medical restrictions justified UPS's decision to terminate her employment is equivalent to asking whether UPS had a legitimate, nondiscriminatory reason for terminating Mason.  This, however, is the subject of the second stage of the *McDonnell Douglas* analysis.  UPS's purported justification for terminating Mason based on her perceived disability does not alter the conclusion in the first stage of the analysis that UPS terminated Mason because of her perceived disability.

UPS also argues we must set aside the Commission's finding it terminated Mason because of her perceived disability because the Commission applied the wrong causation standard.  According to UPS, the FEHA required the Commission to apply a "but for" causation standard (or at least a motivating factor standard), but the Commission applied a standard that merely required discrimination to be "'at least one of the factors.'"  This argument is unavailing for three reasons.

23

First, we review the Commission's decision de novo to determine whether the undisputed facts support the Commission's decision UPS unlawfully discriminated against Mason. We are not bound by the Commission's determination on which causation standard applies, but rather independently determine the controlling causation standard and whether the undisputed facts satisfy that standard. As explained above, UPS's concession it terminated Mason because of her perceived disability satisfies the causation element of the DFEH's prima facie case.

Second, although the Commission generally announced "[d]iscrimination is established if disability was at least one of the factors that influenced [UPS]," it ultimately determined "*the underlying motivating reason* for Mason's firing was shown at hearing to be UPS's regarding and treating Mason as disabled." (Italics added.) Accordingly, regardless of which standard the Commission announced, it concluded UPS terminated Mason's employment because it regarded her as disabled and unable to perform her essential job functions. (See *Chino MHC, LP v. City of Chino* (2012) 210 Cal.App.4th 1049, 1076 ["'"'It is judicial action and not judicial reasoning which is the subject of review'"'"].)

Third, any debate concerning whether the FEHA requires a "but for" or "motivating factor" causation standard is irrelevant here because this is not a mixed-motives case where the parties offered both discriminatory and legitimate reasons for UPS terminating Mason's employment. Here, the DFEH, Mason, and UPS all acknowledge UPS terminated Mason for one reason—it regarded her as disabled. The only question is whether UPS's perception that Mason was disabled provided a legitimate, good faith basis for terminating her employment or served as a pretext for unlawfully discriminating against her. (See *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 215 (*Harris*).)

As *Harris* explained, "The [*McDonnell Douglas*] framework . . . presupposes that the employer has a single reason for taking an adverse action against the

24

employee and that the reason is either discriminatory or legitimate. By hinging liability on whether the employer's proffered reason for taking the action is genuine or pretextual, the *McDonnell Douglas* inquiry aims to ferret out the 'true' reason for the employer's action. In a mixed-motives case, however, there is no single 'true' reason for the employer's action [and the trier of fact therefore must determine what role the discriminatory motives played in the employer's decision]."[6] (*Harris*, *supra*, 56 Cal.4th at p. 215.)

3.  UPS Failed to Establish a Legitimate, Nondiscriminatory Reason for Terminating Mason's Employment

Once the DFEH established a prima facie case of disability discrimination, the burden shifted to UPS to present sufficient evidence of a legitimate, nondiscriminatory reason for terminating Mason. (*Sandell*, *supra*, 188 Cal.App.4th at pp. 307-308.) UPS contends it met this burden by showing it relied on Mason's medical restrictions to support its reasonable and good faith belief Mason's knee injury prevented her from performing her essential job functions for more than 12 months, and therefore allowed UPS to terminate Mason's employment under its 12-month administrative termination policy. We disagree.

In general, it is the employer's honest belief in the stated reasons for firing an employee and not the objective truth or falsity of the underlying facts that are at issue

---

[6]  In *Harris*, the Supreme Court rejected the "but for" standard for mixed-motives cases in favor of the following standard: "When a plaintiff has shown by a preponderance of the evidence that discrimination was a substantial factor motivating his or her termination, the employer is entitled to demonstrate that legitimate, nondiscriminatory reasons would have led it to make the same decision at the time. If the employer proves by a preponderance of the evidence that it would have made the same decision for lawful reasons, then the plaintiff cannot be awarded damages, backpay, or an order of reinstatement. However, where appropriate, the plaintiff may be entitled to declaratory or injunctive relief. The plaintiff also may be eligible for an award of reasonable attorney's fees and costs under section 12965, subdivision (b)." (*Harris*, *supra*, 56 Cal.4th at p. 241.)

25

in the second stage of the *McDonnell Douglas* analysis.  (*Wills*, *supra*, 195 Cal.App.4th at p. 170.)  "[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct.  [Citations.]  While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*.  Thus, 'legitimate' reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding *of discrimination*.  [Citations.]"  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 358, original italics (*Guz*); *Wills*, at p. 171.)

An employer's decision to terminate an employee based on the *assumption* a disability or perceived disability prevented the employee from performing his or her essential job functions does not satisfy this standard because it necessarily relies on prohibited stereotypes and generalizations about the disability.  Before terminating an employee because of a disability, the employer must individually assess whether the disability *actually* prevents the employee from performing those functions.  Unless the employer conducts an individualized assessment, it cannot have a reasonable, good faith belief in the employee's inability to perform his or her essential job functions, and therefore lacks a legitimate, nondiscriminatory reason for terminating the employee.  (See *Guz*, *supra*, 24 Cal.4th at pp. 358-359, fn. 22; *Gelfo*, *supra*, 140 Cal.App.4th at p. 49, fn. 11; *Rodriguez v. ConAgra Grocery Products Co.* (5th Cir. 2006) 436 F.3d 468, 480-482 (*Rodriguez*); *McGregor*, *supra*, 187 F.3d at p. 1116.)

For example, the plaintiff in *Rodriguez* sued an employer for withdrawing an employment offer after a doctor examined the plaintiff and concluded he was medically unqualified for the position because he suffered from uncontrolled diabetes.  (*Rodriguez*, *supra*, 436 F.3d at pp. 471-472.)  The *Rodriguez* court concluded the doctor's recommendation not to hire the plaintiff did not provide a legitimate, nondiscriminatory reason for withdrawing the employment offer because the employer failed to provide the doctor any information about the physical demands or essential functions of the position,

26

and therefore the employer failed to individually assess whether the plaintiff's diabetes prevented him from performing the essential functions of the job. The evidence demonstrated the plaintiff could perform those functions because he had fully performed them while a temporary employee. (*Id.* at pp. 471-472, 480-481.) The *Rodriguez* court explained, "[A]n employer must focus on whether the particular applicant before it is *actually* substantially limited by his impairment and on whether the applicant is *actually* capable of performing the essential functions of the job at issue. . . . '"[E]mployers [are prohibited] from making adverse employment decisions based on stereotypes and generalizations associated with the individual's disability rather than on the individual's actual characteristics."' [Citation.]"[7] (*Id.* at pp. 481-482, original italics.)

Here, UPS assumed Mason could not perform her essential job functions and ran out the clock on its 12-month administrative termination policy based on the medical restrictions Grames placed on Mason. UPS, however, never individually assessed whether those restrictions actually prevented Mason from performing her essential job functions. Without that individualized assessment, the medical restrictions do not provide a legitimate, nondiscriminatory reason for terminating Mason's employment under the 12-month administrative termination policy. (See *Guz*, *supra*, 24 Cal.4th at pp. 358-359, fn. 22; *Gelfo*, *supra*, 140 Cal.App.4th at p. 49, fn. 11; *Rodriguez*, *supra*, 436 F.3d at pp. 480-482; *McGregor*, *supra*, 187 F.3d at p. 1116.)

---

[7] *Rodriguez* was decided under the Americans with Disabilities Act (ADA) (42 U.S.C. § 12101 et seq.), but another California Court of Appeal has relied on *Rodriguez* in construing the FEHA (*Gelfo*, *supra*, 140 Cal.App.4th at p. 49 & fn. 11) and California courts often rely on federal decisions under the ADA when applying similar provisions in the FEHA (*Prilliman v. United Air Lines, Inc.* (1997) 53 Cal.App.4th 935, 948 ["Inasmuch as the FEHA and the interpretative regulations in California Code of Regulations were modeled on the federal Rehabilitation Act of 1973, and the Americans with Disabilities Act of 1990, decisions interpreting those laws may be useful in deciding cases under the FEHA"]). All parties here rely on federal decisions under the ADA to support their contentions.

Had UPS conducted the required individualized assessment, it would have discovered Grames's restrictions prevented Mason from performing her essential job functions for only about six months. Indeed, the Commission's findings reveal the only time periods during which Grames's medical restrictions prevented Mason from performing her essential job functions were (1) August 9 to December 25, 2007, when Grames designated her as temporarily totally disabled while Mason prepared for, underwent, and recovered from her first surgery, and (2) June 26, 2008, until her termination in August 2008, when Grames again designated Mason as temporarily totally disabled while she recovered from her second surgery.

For the first six weeks of Mason's return to work after her first surgery (December 26, 2007, to February 13, 2008), Grames's "sedentary work only" restriction arguably prevented Mason from performing her essential job function of intermittently walking the floor to deliver messages and locate packages, but the Commission found this restriction did not prohibit Mason from doing some walking and she nonetheless performed all her essential job functions with the minor accommodation of coworkers occasionally doing some tasks for her. During the remainder of the time allowed under the 12-month administrative termination policy, Grames's medical restrictions did not prevent Mason from performing her essential job functions. From July 18 to August 8, 2007, Grames authorized Mason to "'[c]ontinue her usual and customary duties'";[8] from February 13 to March 19, 2008, Grames authorized Mason to perform "'limited standing and walking to tolerance'"; and from March 19 to June 26, 2008, Grames imposed no restrictions on Mason walking or standing and only limited the amount of stooping, bending, and kneeling Mason could perform. The Commission's findings further explain

---

[8] From the time Mason first reported her knee injury in June 2007 until she first saw Grames in July 2007, UPS's own doctor only restricted Mason from kneeling, squatting, or using a ladder. UPS's doctor expressly authorized Mason to stand or walk intermittently, which were the only physical requirements necessary to perform her job.

Grames did not consider any of these restrictions inconsistent with Mason's work requirements, and Mason actually performed her essential job functions during these time periods.

UPS contends that, as Mason's treating physician, Grames's assessment of Mason's ability to perform her essential job functions is dispositive and establishes as a matter of law that Mason could not perform those functions. In support, UPS relies on several federal cases allowing an employer to act on a treating physician's assessment without crediting the employee's subjective belief in his or her ability to perform essential job functions. (See, e.g., *Otto v. City of Victoria* (8th Cir. 2012) 685 F.3d 755, 758 [employer not required to allow employee to perform job functions employee's physician specifically prohibited employee from performing despite employee's claim he could perform those tasks]; *Jones v. Walgreen Co.* (1st Cir. 2012) 679 F.3d 9, 18-19 [employer properly relied on physician's recommendation employee could not perform specific tasks employee's job required]; *Johnson v. Cleveland City School District* (6th Cir. 2011) 443 Fed.Appx. 974, 986 [employer reasonably relied on physicians' conclusion employee could not perform specific job requirements despite employee's insistence she could perform those tasks].) These cases are inapposite for three reasons.

First, Grames's restrictions did not prevent Mason from performing her essential job functions for the 12 months required under UPS's 12-month administrative termination policy. As explained above, Mason's medical restrictions only prevented her from performing her essential job functions for about six months. Second, the Commission did not rely on Mason's subjective belief in her ability to perform her essential job functions. Instead, it relied on the objective evidence showing Mason actually performed her essential job functions during a significant portion of the time period UPS assumed she could not perform those duties. The evidence includes not only Mason's testimony, but her supervisor's as well. Finally, an employer "cannot simply point to the medical reports in [an employee's] file, and automatically absolve itself of

29

liability under FEHA." (*Gelfo*, *supra*, 140 Cal.App.4th at pp. 49-50, fn. 11.) Although an employer may accept a physician's assessment of an employee's physical limitations, the employer still must individually assess whether those limitations actually prevent the employee from performing the essential functions of his or her specific job. (*Ibid.*) Here, UPS assumed Grames's restrictions prevented Mason from performing her essential job functions without analyzing whether the restrictions actually prevented Mason from doing her job.

We emphasize we are not confronted with a situation in which the physician who evaluated an employee had information about the specific physical demands of the employee's job or prohibited the employee from performing a specific task required in the employee's job. Here, Grames's work status reports evaluated Mason's physical condition in general terms and her ability to perform generic tasks. Grames made no attempt to correlate the limitations he imposed on Mason and her ability to perform the specific tasks her operations management specialist position required. Indeed, nothing in the Commission's findings or the evidence UPS cites suggests Grames ever received any information about the physical demands of the operations management specialist position. Moreover, outside the six months Grames's deemed Mason temporarily totally disabled, none of the limitations he placed on Mason prevented her from performing any of the tasks the Commission found to comprise her essential job functions.

We therefore conclude UPS failed to meet its burden to establish a legitimate, nondiscriminatory reason for terminating Mason's employment and the Commission properly found UPS discriminated against Mason in violation of the FEHA. This conclusion eliminates the need to address the third stage of the *McDonnell Douglas* analysis—whether the employer's legitimate, nondiscriminatory reason for terminating the employee was actually a pretext for unlawful discrimination.

30

4. The Commission's Finding Mason Failed to Engage in the Interactive Process Does Not Defeat the Disability Discrimination Charge

UPS contends it cannot be liable based on its failure to individually assess whether Mason could perform her essential job functions because Mason's lack of cooperation prevented UPS from conducting that assessment. According to UPS, the disability discrimination charge "is derivative of" the interactive process charge because the statutorily-mandated interactive process was the exclusive means for individually assessing Mason's ability to perform her essential job functions. Consequently, the Commission's finding Mason failed to engage in the interactive process required the Commission to find for UPS on the disability discrimination charge. We find this argument unpersuasive because it erroneously equates the interactive process with UPS's independent obligation to individually assess Mason's ability to perform her essential job functions, and it misconstrues the Commission's findings on the interactive process charge.

Under the FEHA, disability discrimination and the failure to engage in the interactive process are distinct, unlawful employment practices that give rise to independent claims against an employer. (§ 12940, subds. (a) & (n); *Claudio v. Regents of University of California* (2005) 134 Cal.App.4th 224, 242-243.) "'The "interactive process" required by the FEHA is an informal process with the employee or the employee's representative, to attempt to identify a reasonable accommodation that will enable the employee to perform the job effectively.' [Citation.]" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013.) "The interactive process imposes burdens on both the employer and employee. The employee must initiate the process unless the disability and resulting limitations are obvious." (*Ibid.*) "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' [Citation.] 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other

31

information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' [Citation.]" (*Id*. at p. 1014.)

In contrast, liability for disability discrimination does not depend on who obstructed communication between the employer and employee, but turns on whether the employer took an adverse employment action against the employee because of a disability. (See *Wills*, *supra*, 195 Cal.App.4th at pp. 159-160; CACI No. 2500.) The FEHA's prohibition against disability discrimination does not require an employee to initiate or otherwise engage in any sort of dialog or process with his or her employer, and the FEHA imposes liability on an employer regardless whether an employee worked with the employer to identify reasonable accommodations that would allow the employee to effectively perform his or her job despite a disability. As part of a prima facie case in court, the employee must show he or she could perform all essential job functions with or without reasonable accommodations. (See *Wills*, at pp. 159-160.) In the workplace, however, the burden falls on the employer to individually assess the employee and his or her specific job to determine whether a disability prevents the employee from performing the essential functions of that job. (See *Guz*, *supra*, 24 Cal.4th at pp. 358-359, fn. 22; *Gelfo*, *supra*, 140 Cal.App.4th at p. 49, fn. 11; *Rodriguez*, *supra*, 436 F.3d at pp. 480-482; *McGregor*, *supra*, 187 F.3d at p. 1116.) UPS cites no authority that requires an employee to properly engage in the interactive process before the employee can state a disability discrimination claim.[9]

---

[9] UPS and Mason likely could have avoided litigation if either of them had more effectively communicated with the other regarding Mason's injury and her ability to perform her essential job functions. Nothing in the FEHA, however, requires Mason to bear the burden of that shared failure. As explained above, UPS had the duty to individually assess Mason's capabilities, and the FEHA requires us to broadly interpret its provisions to protect employees who are disabled or perceived as disabled. (*Sandell*, *supra*, 188 Cal.App.4th at p. 310.)

Here, the Commission found UPS was not liable for failing to engage in the interactive process because both UPS and Mason shared responsibility for the breakdown. UPS's only dialogue with Mason consisted of "formulaic, boilerplate letters" that erroneously stated Mason had requested a job-related accommodation. The Commission found Mason reasonably believed these letters did not apply to her because she had not requested a job-related accommodation and was either fully performing her job or on workers' compensation leave when she received UPS's letters, but the Commission nonetheless concluded Mason contributed to the breakdown in the interactive process because she failed to notify UPS the letters did not apply to her and she was not seeking a job-related accommodation. Nothing in these findings, however, compels the conclusion Mason prevented UPS from individually assessing whether the medical restrictions Grames placed on Mason prevented her from performing her essential job functions or whether Mason was actually performing those functions.

For example, Mason's failure to respond to UPS's letters did not prevent UPS from comparing the restrictions Grames imposed to the physical demands of Mason's operations management specialist position. As explained above, the express restrictions did not prevent Mason from performing the tasks the Commission found were essential to her job. Similarly, Mason's failure to respond to UPS's letters did not prevent UPS from contacting Mason or her manager to inquire whether Mason was actually performing her essential job functions. As noted above, VanDamme observed Mason performing all of her duties after her first surgery and he was unaware Mason had any medical restrictions until April 2008. UPS provided no evidence or explanation why it failed to communicate with VanDamme regarding Mason's ability to perform her job functions. Accordingly, the Commission properly rejected UPS's contention Mason's failure to engage in the interactive process barred the disability discrimination charge.[10]

[10] Because the Commission found Mason reasonably failed to respond to UPS's letters, we do not address whether an employee's efforts to intentionally prevent

Finally, UPS contends the Commission's decision improperly requires employers to either ignore or second-guess a physician's medical assessment about a patient's ability to perform essential job functions. Not so. The Commission's decision merely requires employers to individually assess an employee's ability to perform his or her essential job functions based on a physician's medical assessment. As the *Gelfo* court explained, the FEHA prohibits an employer from "'slavishly defer[ring] to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions'" and whether the physician's restrictions actually prevent the employee from performing his or her essential job functions. (*Gelfo*, *supra*, 140 Cal.App.4th at pp. 49-50, fn. 11.) Here, Grames testified his restrictions did not prevent Mason from performing her job. Rather than evaluate whether these restrictions affected Mason's ability to perform her essential job functions, UPS simply assumed those restrictions prevented Mason from doing her job.

C.      *UPS Failed to Take All Reasonable Steps to Prevent Discrimination*

The FEHA makes it "an unlawful employment practice . . . [¶] . . . [¶] [f]or an employer . . . to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (§ 12940, subd. (k).) The Commission found UPS violated this prohibition by treating Mason as disabled without conducting an individualized assessment to determine whether she could perform her essential job functions. The Commission also found UPS inadequately trained its managers and supervisors because its training focused on federal law and failed to adequately address California law under the FEHA.

UPS argues it cannot be liable for failing to prevent discrimination that never occurred, citing the same reasons it raised in challenging the disability

an employer from assessing the employee's ability to perform his or her essential job functions would defeat a disability discrimination claim.

34

discrimination charge.  As explained above, however, we conclude the Commission properly found UPS discriminated against Mason in violation of the FEHA.  We therefore reject UPS's challenge to the charge it failed to take all reasonable steps necessary to prevent discrimination from occurring.

## III

### DISPOSITION

The judgment is affirmed.  The Commission and Mason shall recover their costs on appeal.


ARONSON, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


BEDSWORTH, J.